UNITED STATES *v.* JELLICO MOUNTAIN COAL & COKE Co. *et al.*

*(Circuit Court, M. D. Tennessee. June 4, 1891.)*

CONSPIRACY—TRUST COMBINATION—INTERSTATE COMMERCE.

An agreement between coal mining companies operating chiefly in one state and dealers in coal in a city in another state, creating a coal exchange to advance the interests of the coal business, to treat all parties to the business in a fair and equitable manner, and to establish the price of coal, and change the same from time to time, by which it was agreed that the price of the coal at the mines should be $4\frac{1}{2}$ cents, the freight being 4 cents, and the margin of the dealer should be $4\frac{1}{2}$ cents, making the price to the consumer 13 cents, and that, whenever the price of the coal is advanced beyond an advance in freights, one-half the advance shall go to the mine owner, and the other half to the dealer, and a penalty was provided by fine, of any member selling coal at a less price than the price fixed by the exchange, and by which it was forbidden for owners or operators of mines to sell coal to any person other than members of the organization, and for dealers to purchase of miners who were not members, but exempting coal used for manufacturing and steamboat purposes from the prices prescribed until all the mines tributary to that market should come into the exchange, or until the exchange could control the prices of coal used by manufacturers, is within the language of Act Cong. July 2, 1890, declaring "every contract or combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states," and also the monopolizing, or combination with another to monopolize, trade or commerce among the several states, a misdemeanor.

In Equity. On bill for injunction.

*John Ruhm,* U. S. Atty., *Lee Broock,* Asst. Dist. Atty., and *James Trimble,* for the United States.

*Tillman & Tillman, Henderson & Jourolman,* and *Hill & Granberry,* for defendants.

KEY, J.  The petition in this case is filed against the members of the Nashville Coal Exchange. The membership of the exchange is composed of various coal mining companies operating mines in Kentucky and Tennessee, chiefly in Kentucky, and of persons and firms dealing in coal at Nashville, Tenn. It is alleged that the purposes, objects, and agreement of the defendants are in violation of an act of congress approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and the petition seeks to restrain and prevent the violations of the act by injunction under section 4 of the law. The first section of the act declares that "every contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, is declared illegal." The second section declares that "every person who shall monopolize, or combine or conspire with another person or persons to monopolize, any part of the trade or commerce among the several states * * * shall be guilty of a misdemeanor." A violation of the first section is a misdemeanor also. By the fourth section jurisdiction is conferred upon the circuit courts of the United States to prevent and restrain violations of the act, and it is made the duty of district attorneys in their respective districts, under the direction of the attorney general of the United States, to institute proceedings in equity to prevent and restrain such violations. The articles of agreement between the defendants provide, among other things, that the objects of this exchange are, "To do all in its power to advance the interests of the coal business at Nashville, to treat all parties to this agreement in a fair and equitable manner, and to establish prices on coal at Nashville, Tenn., and to change same from time to time, as occasion may require." Prices to consumers at Nashville are to be established so as to sell coal at a fair and reasonable price, so as to allow all parties a fair profit for their product. Every person, firm, or corporation owning or operating mines who ship coal to Nashville shall be eligible to membership in this exchange, and all coal dealers in the city of Nashville are also eligible to membership. None others are eligible. Any member of the exchange who may withdraw from it, and continue in the coal trade in Nashville, or ship any coal to Nashville, shall forfeit and relinquish all interest of any and every kind, however obtained or accrued. The exchange will from time to time establish prices at which coal shall be sold in Nashville. Coal classed as N shall be valued at the mines at 4½ cents minimum price for bushel pounds lump, and freight being 4 cents, the dealer's margin to be 4½ making the price of lump coal 13 cents per bushel; No. 2 to be v at 5 cents at the mine; No. 3 at 6 cents; and when the above pric advanced in excess of the advance in freights, then one-half the ad shall go to the mine owners and one-half to the dealers. Every ber found guilty of selling coal at a less price than the price fix the exchange, either directly or indirectly, shall be fined 2 cent bushel and $10 for the first offense, and 4 cents per bushel and $2 the second offense. A majority of all the members shall consti quorum for the transaction of business. Owners or operators of

shall not sell or ship coal to any person, firm, or corporation in Nashville, or West Nashville, or East Nashville, who are not members of the exchange, and dealers shall not buy coal from any one not members of the exchange. All coal used for manufacturing and steam-boat purposes shall be exempt from prices made by the exchange until all mines tributary to this market shall become members of the exchange, or until the exchange can control prices to govern coal used by manufacturers. No coal shall be sold in any month to be delivered, in any following month except at prices fixed for the particular month in which coal so sold is to be delivered. Fines and penalties are declared, so as to enforce the stipulations embodied in the constitution and by-laws of the exchange.

It can hardly be denied that such provisions as these, by a body of persons such as compose this exchange, is a contract or combination in restraint of trade or commerce, or an attempt between different persons to monopolize a part of the trade or commerce, between parties who are citizens of or reside in different states. . It is shown that several mining companies in Kentucky engaged in raising coal, and most of the coal dealers of Nashville, Tenn., have entered into the foregoing mentioned arrangement. It is insisted for the defendants that the subject of agreement is not interstate commerce; that the obligation as to the mining companies ends at the mines. The price is fixed and paid at that point, and consequently controversies in regard to the contract as to them belong exclusively to the courts of the state of Kentucky; that, so far as the dealers are concerned, the price of the coal is fixed for its sale at Nashville, and after it becomes their property by delivery to them, and therefore the courts of Tennessee have the jurisdiction as to them. Various authorities are cited, and the debates in the senate of the United States are read, to sustain this view of the case. As I understand the contention of defendants' counsel it is that the agreement is not violative of the terms of the act of July 2, 1890; but, if it is, the act is unconstitutional: *First.* Because the constitution confers upon the courts of the United States in such a case jurisdiction over "controversies between citizens of different states." That the fact that parties to a contract are citizens of different states does not confer jurisdiction. There must be a controversy between the parties to the contract, and this litigation is not a dispute between the contracting parties, but between the government and these parties. *Second.* That the act creates and defines criminal offenses, and the constitution provides that the "trial of all crimes except in cases of impeachment shall be by jury," and that section 4 of the act, so far as it attempts to give circuit courts of the United States able jurisdiction over the violations of the act, is unconstitutional. It is insisted the proceeding authorized is, in substance, an information only charging defendants with a misdemeanor. 

I shall not enter into a discussion of the constitutionality of the law. A court, especially an inferior one, should hesitate long and consider fully before it should declare an act of congress, passed after deliberate and debate, and approved by the president, unconstitutional. The

reasons for such a decision in such a case should be clear and undeniable. If doubtful or questionable, the doubt should be resolved in favor of the law. The arguments against the validity of the act have been urged with great plausibility and strength, and an array of authorities have been read as sustaining the views of defendants' counsel. The positions of defendants' counsel have been met with equal force and ability by those representing the government, and many authorities have been referred to in support of the power of congress to pass the law; and without nicely adjusting and weighing the opposing views of counsel, enough appears to prevent me from declaring the act, or any part of it, as outside of the powers granted to congress by the constitution.

The remaining question is whether the agreement and regulations between the defendants are a "contract or combination in restraint of trade or commerce between states;" are they evidence of a combination to monopolize "any part of the trade or commerce" between the states of Tennessee and Kentucky? The coal mines are in Kentucky, and the coal is to be mined there for a certain price, and the agreement contenplates its shipment to Nashville. To be sure it is not to be transported thither by the defendants or any of them, but the price for which it is to be shipped is fixed or stated, and becomes a part of the price for which the coal is to be sold at Nashville; and when the prices fixed "are advanced in excess of the advance in freights, the one-half of the advance shall go to the mine owners and one-half to the dealers." In making the agreement the transportation of the coal from Kentucky to Nashville was a necessary incident to and element in the arrangement, and its execution would have been impossible without it. The instrumentality of transportation did not belong to nor was it controlled by them, but it was used by them and paid by them for services rendered. The contract provided for the sale of coal in Kentucky, its shipment to Nashville, Tenn., to dealers there, for its retail to consumers. It was, to all intents and purposes, a traffic, trade, commerce between states. Was the purpose of the exchange to monopolize a part of this trade, or to combine in restraint thereof? The exchange does not propose to be governed and controlled by the public markets arising from competition and the operations of the laws of supply and demand. On the contrary, it announces that its purpose is "to establish prices on coal at Nashville, Tenn., and to change the same from time to time as occasion may require," and in carrying out this object it asserts that—

"The exchange will establish prices at which coal shall be sold in Nashville, subject, however, to the following conditions and basis: Coal classed No. 1 to be valued at the mines at $4\frac{1}{2}$ cents minimum price per bushel of 80 lbs. for lump, and freight being 4 cents, the dealer's margin to be $4\frac{1}{2}$ cents, making the price of lump coal 13 cents per bushel; No. 2 to be valued at ⸱⸱ at the mines, No. 3, 6 cents; and when the above prices are advanced in excess of the advance in freights, then one-half of the advance shall go to mine owners and one-half to the dealers. Any member found guilty of selling coal at a less price than the price fixed by the exchange, either directly or indirectly, shall be fined 2 cents per bushel and $10 for the first offense, 4 cents a bushel and $20 for the second offense."

These provisions, so far as this combination could do so, fixed the lowest price of coal to consumers in and near Nashville at 13 cents per bushel, and prevented coal being sold there at a cheaper rate, no matter how much less it might cost in an open and unobstructed market. Nor is this all. The exchange ordains that "owners or operators of mines shall not sell or ship coal to any firm, person, or corporation in Nashville or West Nashville or East Nashville who are not members of this exchange, and dealers shall not buy coal from any one who is not a member of the exchange." The coal trade is confined, so far as the market supply is concerned, to transactions between the miner and dealer, the prices are fixed by them, and the miner and dealer only are eligible to membership. The miners of the concern cannot sell to any dealer in or near Nashville who is not a party to the agreement, nor can such dealer purchase coal of any miner anywhere who is not a member of the body. The operations of both are confined within the membership. So far as Nashville is concerned, they cannot go to cheaper or more favorable markets, or deal with those who would give more favorable terms. The restraint is positive and undeniable. Moreover, in the first section of the by-laws of the exchange it is asserted that "all coal used for manufacturing and steam-boat purposes shall be exempt from prices made by this exchange until all mines tributary to this market shall become members of the exchange, or until the exchange can control prices to govern coal used by manufacturers." This clearly indicates the purpose of the association to be to control the price of coal in the Nashville market used in manufacturing and in steam-boats whenever it could; that the mines of coal tributary to Nashville were all expected to become members of the exchange, whereupon the prices of coal could be fixed absolutely, and the necessary inference from this declaration and the entire organic structure of the body is that it felt strong enough already to regulate and establish the prices of domestic coal in that market, to a large extent, at least, and that this exchange might now monopolize the business of dealing in domestic coal in the Nashville market, and in the future monopolize by and confine to its membership the entire trade in coal at that point. It seems to me that the purposes and intentions of the association could hardly have been more successfully framed to fall within the provisions of the act of July 2, 1890, had the object been [to org]anize a combination, the business of which should subject it to the [penalt]ies of that statute, and that there is no need of authorities to sustain [su]ch view of the case. Regarding the act as constitutional, I see no [way fo]r the defendants to escape its condemnation.

[Pro]of has been taken, on one hand, to establish that the people of [Nashv]ille have been and are being injured by the high prices which have [been a]nd are being paid for coal, and the extent of the injury. On the [other] hand, defendants have introduced proof to show that the higher [freigh]t rates to Nashville, and the want of facilities for transportation by [railroa]d and water, are the causes for the higher prices of coal at Nash[ville th]an at Louisville or Memphis, but it is needless to enter upon this [field] of dispute. "The attempt to monopolize or combine" is de-

nounced by the second section of the act, and the first section declares that "every contract or combination * * * in restraint of trade or commerce among the several states * * * is hereby declared illegal." The attempt—the contract to do the thing prohibited—is enough to incur the penalties of this law.

I conclude that the defendants, by the organization of the Nashville Coal Exchange, and their operations under it, have been, and at the time of filing the petition in this cause were, guilty of a violation of sections 1 and 2 of the act of July 2, 1890, and should be enjoined from further violations of the law, as provided by the fourth section thereof.

The petition will be dismissed as to such of the defendants as are not, or were not, members of the exchange at the time of the filing of the petition