CONTINENTAL INS. CO. v. BOARD OF FIRE UNDERWRITERS OF THE PACIFIC et al.

(Circuit Court, N. D. California. March 25, 1895.)

1. CONSPIRACY—COMBINATION OF FIRE UNDERWRITERS—INJUNCTION.

An association of fire underwriters, formed under an agreement providing for the regulation of premium rates, the prevention of rebates, the compensation of agents, and nonintercourse with companies not members, is not an illegal conspiracy, and the accomplishment of its purposes by lawful means will not be enjoined at the instance of a company not a member of the association.

2. SAME.

The dismissal of an agent by one of the associated companies for refusal to represent such companies exclusively, and a refusal to place insurance for outside companies, are lawful means to accomplish the purposes of the association.

3. SAME—BOYCOTT.

The advertisement by an agent of certain of the associated companies that he had authority to cancel policies of outside companies, and rewrite them at lower rates, when in fact he had no such authority, and threats to boycott the agents and customers of such outside companies unless they withdrew their patronage, are illegal, and will be enjoined.

Bill for an injunction brought by the Continental Insurance Company against the Board of Fire Underwriters of the Pacific and others.

Delmas & Shortridge, for complainant.
Page & Eells and T. C. Coogan, for defendants.

McKENNA, Circuit Judge. The nature of the action will be developed as I proceed. The case has been very elaborately argued, and the interests involved are great, and the opinion, therefore, will be quite lengthy. The bill is long, and alleges, substantially:

That the Board of Fire Underwriters of the Pacific is a secret association composed of the representatives of certain fire insurance companies, and that it has adopted a constitution providing, among other things, for (1) regulation of premium rates (two-thirds membership fixing these); (2) prevention of rebates; (3) compensation of agents; (4) nonintercourse with companies not members. The penalty for violation of these provisions is the cancellation and prohibition to writ or place, within one year, the risk or risks covered, and the rate or rates effected shall be increased 15 per cent. Compensation to agents not to exceed 15 per cent., with certain exceptions. The nonintercourse clause of the constitution is as follows:

"Sec. 5. No member shall permit any company under his control to be represented by the agent of any company not represented in this board, nor shall he reinsure, nor accept from, nor place or cause to be placed, whether by reinsurance or otherwise, any business in any company or agency not represented in this board, except with the consent of the executive committee. In presence of nonboard or unconstitutional competition, a member may protect his business in accordance with the general rules, and any rate of premium necessary, and not otherwise: provided, he immediately reports the facts in writing to the executive committee, who shall grant relief, the charges of unconstitutional competition being sustained by a majority of the executive committee."

And the pledge taken by the members is as follows:

"I hereby agree, with each and all of the signers of this agreement, to observe, in good faith, without evasion or mental reservation of any kind, all of the provisions of the constitution and rules and regulations of the Board of Fire Underwriters of the Pacific, as they now are or may be hereafter constitutionally amended, holding myself faithfully to the spirit as well as to the letter of this agreement. My signature is also understood as binding upon my associates in management, special agents, and all other employés of my office. Also that I will not regard myself as relieved from any obligation assumed, notwithstanding the violation of such obligation by another member, except upon written resignation, sent not less than fourteen days nor more than twenty-one days after service of written notice of my intention to resign, and until after all assessments shall have been paid, except that upon demand, agreed upon by a majority vote of the entire membership, such vote being confirmed at a subsequent meeting not less than five days later, my name may be stricken from the roll without further notice."

That the purpose of the association is to coerce plaintiff and others transacting business of like character to become members, and to obstruct and annoy it and its agents and assureds, in granting insurance, because it is not a member, with a view to induce it to become such, and that the said association is designed to interfere with plaintiff's freedom in the proper management of its business, and that it assumes to dictate upon what terms the business shall be conducted, by means of threats of injury or loss. And it is also alleged that the object of the board and the defendants is to interfere with plaintiff's perfect freedom of action; that the board and its associates have entered into a conspiracy to prevent plaintiff from following its business, and that such conspiracy is unlawful, and has a tendency to prejudice the public or oppress individuals, and unjustly subject them to the power of the confederates; that the said board and its associates have attempted and are attempting to boycott plaintiff, in its business, by inducing its servants to abandon its service because it will not make its rates conform to those fixed by the board, and for the express purpose of injury to its business, and that they have threatened its assureds with a boycott in case they continue their patronage of plaintiff, and attempt, by coercion, to destroy competition, and that their purpose is to coerce it and all other nonmembers to become members; and that the said board is designed to prevent a just discrimination between the ability and industry of agents.

The particular acts complained of are as follows:

(1) That the Fireman's Fund Insurance Company sent to certain of its agents, who were also agents of plaintiff, the following letter:

"San Francisco, February, 1895.

"Wooster & Ensign, Agents, San José, Cal.: As has already been notified to you, we are members of the Board of Fire Underwriters of the Pacific,— an organization for the bettering of our common business, including the reduction of the fire loss by the improvement of fire equipment of the various cities and towns of this coast, and the promotion of safe construction of buildings. The members of the board pay the expenses incidental to this work, and consider it unjust that any insurance company should participate in benefits, only to be gained by co-operation, without contributing its share of the necessary expense. We have decided that it is impracticable for us to be represented by the representatives of companies

which pursue a business policy totally at variance with ours. We are informed that the following company is in your agency: Continental Insurance Company. Regretting the circumstances which compel us to put you to any trouble, we have to urgently request you to decide at once whether it is for your better interest to continue to act as our agent, exclusively, or as agent of companies not represented in the board. We inclose addressed envelope for your answer. Hoping that you will see that your interests are concurrent with our decision, and that your reply to that effect will be immediate, we remain,

"Yours, truly,                                      Fireman's Fund Ins. Co.
                                         "Louis Weinmann, Ass't Secretary."

(2) Threats, through their representatives at Salt Lake City, of "boycotting" (to quote the bill) "the public, firms, individuals, and assureds who patronized your orator's said business with their custom, and hold policies from your orator and other so-called 'nonboard' companies and corporations, unless such assureds forthwith cancel such policies."

(3) That defendant's representative at San José, Cal., to wit, Messrs. Rucker & Co., of that city, caused to be inserted in the San José Mercury, a paper of great influence and circulation, the following advertisement:

"Have you a policy in any of the following companies? Home, of New York; Phoenix, of Hartford; Northwestern National; Continental, of New York; Franklin, of Pa.; Williamsburg City, N. Y.? If you have, bring them to our office without delay, as we have authority to cancel and rewrite them at any rate necessary to get the business.          Rucker & Co.,
                                          "No. 8 North First Street.

The answer of the defendant denies that the board is a secret association, and denies the formation of a conspiracy for the purpose and design of coercion, vexation, dictation, and interference, or boycott, imputed to them by plaintiff, or a purpose to compel plaintiff or others to join said board, or that the object of the board is to oppress or coerce, or that it does or will oppress or coerce, the public or individuals. They allege that the board was created for, and its object is, to regulate the business of its members, and to prevent, whenever possible, by arrangement between themselves, a ruinous competition of rates, and that they, in common with other companies, have attempted and attempt to obtain business for their respective offices, and seek to obtain business which is placed in other offices, and that such conduct is now, and always has been, followed by the plaintiff. Replying to the specific acts alleged by plaintiff, defendant denies that the defendant addressed or threatened plaintiff's agent, but avers, in effect, that in cases where the agents of plaintiff were also agents of some of the defendant companies, the latter, on account of the business antagonism between them and plaintiff, advised or required an election of said agents between them; that some such agents preferred plaintiff, and some the defendant companies. The circular letter is admitted, and it is averred that it is the sole ground of the charges of conspiracy, contained in the bill, to prevent plaintiff from employing agents. The charge of boycotting at Salt Lake City is denied on information and belief. The advertisement in the San José Mercury is admitted, but it is denied it was published as a result of an unlawful combination or conspiracy, or

by the representatives of defendant, or in any manner to boycott the plaintiff, or other nonmembers of the board. It is admitted that Rucker & Co. are the agents of various members of said board, but not of a large number, as alleged in the bill, and it is averred that the notice was printed because plaintiff and other nonboard companies had attempted and were attempting, by offers of low rates of insurance, to take from said Rucker & Co. their customers, patrons of the companies represented by them, and that the act of Rucker & Co. was lawful, and done to meet the competition of plaintiff and others in insurance business. The answer concludes with the allegation, substantially, that defendant has done no act, and that it does not contemplate any act, which will damage plaintiff, other than such as may arise from competition, and that the acts of defendants have been done as individuals, to protect, respectively, their business against competition offered, and have not been done under any conspiracy or combination whatever; that their association is to promote the safety and success of their business; that it is voluntary, and is not designed to admit or exclude from its membership the plaintiff or any person, or to compel it or other companies to join the same.

Numerous affidavits have been filed. They respectively affirm and deny the formation of a conspiracy, and the boycotting purposes of the board. In all else there is very little contradiction, and whatever there is can be easily reconciled without imputation of discredit to the makers. They display, as the pleadings do, a bitter business antagonism and warfare. The contention between the parties is quite clearly defined. The bill is—omitting repetitions and amplifications—that the defendant has unlawfully combined to stifle competition, and to prevent plaintiff from carrying on its business, and that it did prevent it, by coercing plaintiff's agents and customers, and by unjust discrimination. The defendants deny the charges, and assert that the combination is a lawful one to promote their business interests, and that the acts of nonintercourse and nondealing with plaintiff and others are intended to meet the antagonism and competition of business adversaries. It is necessary, therefore, to consider the character of the combination; and the character of the means used.

It may be said, in the beginning, that there is no proof of any act done by the board. The acts proved are those of individual companies, and, unless these can be imputed to the board, the latter cannot be said to have done anything. It was admitted at the oral argument that some of the acts of the defendant companies were lawful, of themselves. For instance, it was admitted that it was competent and lawful for a board company to choose to be served, or not to be served, by an agent who was also agent of the plaintiff; that it was competent and lawful for it to accept or refuse reinsurance from the plaintiff or its customers, or anybody, or join or not join in insurance with either. These, it was conceded, were business privileges which might have various and justifiable motives, but it was contended that, the combination being unlawful, these acts lost their privilege, and became unlawful, too. This makes the first,

if not the principal, inquiry the character of the combination. Was it unlawful? To put it more narrowly, and hence more precisely, for our purpose, was it so far illegal that the plaintiff may complain of it, and enjoin it, or its acts, without regard to the quality of the latter? To a like inquiry, in an almost similar case, a negative answer was given in Mogul Steamship Co. v. McGregor, 21 Q. B. Div. 544, and 23 Q. B. Div. 598, also [1892] App. Cas. 25. The original decision was made by Lord Chief Justice Coleridge, and affirmed by the court of appeals, queen's bench division, and subsequently by the house of lords. From the distinguished character of the judges and tribunals who decided it, and the consideration it received, and its approval by American cases, it must be regarded as high authority. An outline of its facts is as follows: The plaintiffs were a shipping company, incorporated to acquire, and they did acquire, shares in certain steamships built for and employed in the Chinese and Australian trades. The defendants were an associated body of shipowners, trading, among other places, between China and London, who formed themselves into a conference or association for the purpose of keeping up the rate of freight between China and Europe, and securing that trade to themselves. The defendants alleged, and it was found true, that the large profits derived from the tea freight alone enabled them to keep up a regular line of communication all the year round between England and China, and that, without a practical monopoly of the tea trade, they must cease to do so. The plaintiffs were admitted to the benefits of this conference for the season of 1884, when a circular was widely distributed, notifying those who shipped in the association's steamers that they would be allowed a rebate of 5 per cent. on the freight charged, exporters to sign a declaration that they had not been interested in shipments by other lines; shipments by an outside steamer at any of the ports of China and Hong Kong to exclude the firm making such shipments from participation in returns during the whole six-monthly period within which made, even although its other branches may have given entire support to the above lines. In May, 1885, another circular was issued, which excluded plaintiffs from the benefit of the conference. The acts of which the plaintiffs particularly complained were as follows: (1) The circular of May, 1885, offering a rebate to shippers who would not deal with plaintiffs;' such rebate to be lost if they did. (2) Sending special ships to Han Kow, in order, by competition, to deprive plaintiff's vessels of profitable freights. (3) The offer, at Han Kow, of freights at a figure which would not repay a shipowner for his adventure, in order to "smash" freights, and frighten plaintiffs from the field. (4) Pressure on defendants' agents, who were also agents of other lines, to induce them to ship only by defendants' vessels, and not by those of plaintiffs. The resemblance between this case and the one at bar is obvious. The defendants combined, excluding plaintiffs, to engross the tea trade from China, and maintain freights which a free competition would have lowered. The means by which it was to be done were: (1) Lowering of freights against competitors, and granting rebates to their own customers. (2) Sending special ships to compete with opposing ships, to take

freight at any rate.   (3) Preventing its agents from being agents of other companies.  In both cases there is a combination to keep up rates,—in one of freight, and in the other of insurance,—and competition was pushed in both by an inducement of favorable rates to customers, or threats of unfavorable rates against them, and by the exclusion of agents from a joint representation of the contending parties.   The opinions in the case are too long to quote at length, but extracts from them will be instructive.   Each elaborately considered the law of conspiracy, and its application to the facts, and also considered in what sense the law regards the legality of contracts in restraint of trade.   A clear distinction was also drawn between acts which had inducement in malice or ill will, and those which had inducement of business competition and rivalry.   Speaking of the combination, Lord Chief Justice Coleridge said:

"The law may be put thus: if the combination is unlawful, then the parties to it commit a misdemeanor, and are offenders against the state; and if, as the result of such unlawful combination and misdemeanor, a private person received a private injury, that gives such person a right of private action.  It is therefore, no doubt, necessary to consider the object of the combination, as well as the means employed to effect the object, in order to determine the legality or illegality of the combination. And in this case it is clear that if the object were unlawful, or if the object were lawful, but the means employed to effect it were unlawful, and if there were a combination either to effect the unlawful object, or to use the unlawful means, then the combination was unlawful, then those who formed it were misdemeanants, and a person injured by their misdemeanor has an action in respect of his injury."

And he further said:

"I do not doubt the acts done by the defendants here, if done wrongfully and maliciously, or if done in furtherance of a wrongful and malicious combination, would be ground for an action on the case, at the suit of one who suffered injury from them. The question comes at last to this: What was the character of these acts, and what was the motive of the defendants in doing them? The defendants are traders, with enormous sums of money embarked in their adventures, and naturally and allowably desirous to reap a profit from their trade. They have a right to push their lawful trade by all lawful means. They have a right to endeavor, by lawful means, to keep their trade in their own hands, and by the same means to exclude others from its benefits, if they can. Amongst lawful means is certainly included the inducing, by profitable offers, customers to deal with them, rather than with their rivals. It follows that they may, if they think fit, endeavor to induce customers to deal with them exclusively, by giving notice that only to exclusive customers will they give the advantage of their profitable offers. I do not think it matters that the withdrawal of the advantages is out of all proportion to the injury inflicted on those who withdraw them by the customers, who decline to deal exclusively with them, dealing with other traders. It is a bargain which persons in the position of the defendants here had a right to make, and those who are parties to the bargain must take it or leave it as a whole. Of coercion, of bribing, I see no evidence; of 'inducing,' in the sense in which that word is used in the class of cases to which Lumley v. Gye [2 El. & Bl. 216] belongs, I see none either. * * * But it is said that the motive of these acts was to ruin the plaintiffs, and that such a motive, it has been held, will render the combination itself wrongful and malicious, and that if damage has resulted to the plaintiffs an action will lie. I concede that if the premises are established the conclusion follows. It is too late to dispute, if I desired it, as I do not, that a wrongful and malicious combination to ruin a man in his trade may be ground for such an action as this. Was, then, this combination such? The answer to this question has given me much trouble, and I

confess to the weakness of having long doubted and hesitated before I could make up my mind. There can be no doubt that the defendants were determined, if they could, to exclude the plaintiffs from this trade. Strong expressions were drawn from some of them in cross-examination, and the telegrams and letters showed the importance they attached to the matter, their resolute purpose to exclude the plaintiffs if they could, and to do so without any consideration for the results to the plaintiffs, if they were successfully excluded. This, I think, is made out, and I think no more is made out than this. Is this enough? It must be remembered that all trade is, and must be, in a sense, selfish. Trade not being infinite, nay, the trade of a particular place or district being possibly very limited, what one man gains another loses. In the hand to hand war of commerce, as in the conflicts of public life, whether at the bar, in parliament, in medicine, in engineering (I give examples only), men fight on without much thought of others, except a desire to excel or to defeat them. Very lofty minds, like Sir Philip Sydney with his cup of water, will not stoop to take an advantage, if they think another wants it more. Our age, in spite of high authority to the contrary, is not without its Sir Philip Sydneys; but these are counsels of perfection which it would be silly indeed to make the measure of the rough business of the world, as pursued by ordinary men of business. The line is, in words, difficult to draw, but I cannot see that these defendants have in fact passed the line which separates the reasonable and legitimate selfishness of traders from wrong and malice. In 1884 they admitted the plaintiffs to their conference. In 1885 they excluded them, and they were determined, no doubt, if they could, to make the exclusion complete and effective, not from any personal malice or ill will to the plaintiffs, as individuals, but because they were determined, if they could, to keep the trade to themselves; and if they permitted persons in the position of the plaintiffs to come in and share it they thought—and honestly, and, as it turns out, correctly thought—that for a time, at least, there would be an end of their gains. * * * On the whole, I come to the conclusion that the combination was not wrongful and malicious, and that the defendants were not guilty of a misdemeanor. I think that the acts done in pursuance of the combination were not hurtful, not wrongful, not malicious, and that, therefore, the defendants are entitled to my judgment." Steamship Co. v. McGregor, 21 Q. B. Div. 544.

In the court of appeals these views were enlarged upon and confirmed, and variously illustrated. Of illegal contracts, Lord Justice Bowen said:

"Lastly, we were asked to hold the defendants' conference or association illegal, as being in restraint of trade. The term 'illegal,' here, is a misleading one. Contracts, as they are called, in restraint of trade, are not, in my opinion, illegal, in any sense, except that the law will not enforce them. It does not prohibit the making of such contracts. It merely declines, after they have been made, to recognize their validity. The law considers the disadvantage so imposed upon the contract a sufficient shelter to the public. The language of Crompton, J., in Hilton v. Eckersley [6 El. & Bl. 47], is, I think, not to be supported. No action at common law will lie, or has ever lain, against any individual or individuals, for entering into a contract, merely because it is in restraint of trade. Lord Eldon's equity decision in Cousins v. Smith, [13 Ves. 542] is not very intelligible, even if it be not open to the somewhat personal criticism passed on it by Lord Campbell in his 'Lives of the Chancellors.' If, indeed, it could be plainly proved that the mere formation of 'conferences,' 'trusts,' or 'associations,' such as these, were always necessarily injurious to the public,—a view which involves, perhaps, the disputable assumption that in a country of free trade, and one which is not under the iron regime of statutory monopolies, such confederation can ever be really successful,—and if the evil of them were not sufficiently dealt with by the common-law rule which holds such agreements to be void, as distinct from holding them to be criminal, there might be some reason for thinking that the common law ought to discover within its arsenal of sound, common-sense principles some further remedy commensurate with

the mischief. Neither of these assumptions is, to my mind, at all evident, nor is it the province of judges to mold and stretch the law of conspiracy in order to keep pace with the calculations of political economy. If peaceable and honest combinations of capital for purposes of trade competition are to be struck at, it must, I think, be by legislation, for I do not see that they are under the ban of the common law."

To the same effect, Lord Justice Fry expressed himself as follows:

"But if one man may, by competition, strive to drive his rival out of the field, is it lawful or unlawful for several persons to combine together to drive from the field their competitor in trade? It is said that such an agreement is in restraint of trade, and therefore illegal. Be it so. But in what sense is the word 'illegal' used in such a proposition? In my opinion, it means that the agreement is one upon which no action can be sustained, and no relief at law or in equity had, but it does not mean that the entering into the agreement is either indictable or actionable. The authorities on this point are, I think, with a single exception, uniform. * * * The language of all the judges in the cases of Hornby v. Close [L. R. 2 Q. B. 153] and Farrer v. Close [L. R. 4 Q. B. 602] is consonant with that of Lord Campbell and Erle, J., in Hilton v. Eckersley [6 El. & Bl. 47], and Crompton, J., I believe, is the only judge who has hitherto held such contracts illegal as well as void." 23 Q. B. Div. 620.

There was but one dissenting opinion,—that of Lord Esher, master of the rolls. He held that the combination was unlawful, and indictable as a conspiracy, and "that when it was carried out to its immediate and intended effect," to quote his language, "which was an injury to the plaintiffs' right to a free course of trade, the plaintiffs had a good cause of action." But the learned justice based the right, not on the injury to the public, nor on the monopoly of the tea trade, nor on the favoritism to customers, nor on the restraints of agents, but on the acts of defendants in lowering freights far beyond a lowering for any purpose of trade; that is to say, he observed, "so low that if they continued it they themselves could not carry on trade," which he held was an act done to interfere with defendants' free course of trade,—a right which could hardly be urged by the plaintiff in this case.

In support of the English case, the following American cases may be cited: Snow v. Wheeler, 113 Mass. 179; Bowen v. Matheson, 96 Mass. 499; In re Greene, 52 Fed. 119; Carew v. Rutherford, 106 Mass. 14; Insurance Co. v. State, 86 Tex. 250, 24 S. W. 397; Manufacturing Co. v. Hollis (Minn.) 55 N. W. 1119. A review of these cases would be demanded, if time permitted, and if it were not necessary to review those claimed by plaintiff's counsel to oppose and countervail their authority.

Counsel urge, "It is against public policy to enter into any agreement or combination, the object of which is in restraint of trade, or the obtaining of a monopoly of any article or commodity for the purpose of stifling competition and enhancing the price." In considering this, and the broader contentions of counsel, and the cases cited by them, we must not overlook that it is not the abstract quality of defendant's association and acts, or their relations with the general public, or with one another, but the rights, injuries, and remedies of the plaintiff, which will be regarded.

Broader considerations than these I may not indulge or yield to. My function is not of that kind or degree which may assent to or oppose all the views urged, and eloquently urged, by counsel.   No doubt, many methods which business competition or advantage uses may, if contemplated from one aspect, seem to call for legal repression; and, as Lord Justice Bowen says, "legal puzzles which might well distract a theorist may easily be conceived, of imaginary conflicts between a group of individuals and the obvious well-being of other members of the community."   These reflections admonish us not to judge from a too abstract contemplation of evils, not to attempt to distinguish fair and unfair competition from debatable considerations of political economy, but to adhere to and decide the questions in the case by legal precedents.   This, though it may seem narrow, from some points of view, is as broad as a legal tribunal may indulge, whose confined function is, as has often been said, to administer the law as it is, not as it ought to be.   In this disposition I have reviewed the cases already quoted, and shall review those cited by defendant's counsel.

In the case of Lumber Co. v. Hayes, 76 Cal. 387, 18 Pac. 391, the action was between the parties, to enforce what the court held to be illegal contracts in restraint of trade, to wit, the enhancement of the price of lumber; and the court said, "Their execution will be left to the volition of the parties thereto."   But this is the doctrine of Steamship Co. v. McGregor, supra.   "The law does not prohibit such contracts," said Lord Justice Bowen; "it merely declines to recognize their validity.   The law considers the disadvantage so imposed upon the contract a sufficient shelter to the public."

Factor Co. v. Adler, 90 Cal. 110, 27 Pac. 36, was, like Lumber Co. v. Hayes (Cal.) 18 Pac. 391, an action between the parties to an illegal contract, and may be classed by the same comment.

The case of People v. Sheldon (N. Y. App.) 34 N. E. 785, was a criminal action under the Penal Code of the state.   Section 168 of the Code of that state makes it a misdemeanor for two or more persons to conspire "to commit any act injurious to the public health, to public morals, or to trade, or commerce, or for the perversion or obstruction of public justice, or of the due administration of the laws."   The defendant entered into an agreement with others, comprising all the retail dealers in the city of Lakeport, except one, to organize the Lakeport Coal Exchange.   The agreement between its members constituted the exchange the sole authority to fix the price which should be charged by the members, individually, for the coal sold by them.   The court held that this was an act "injurious to trade or commerce," within the meaning of those words in the statutes.   No conclusion applicable to the case at bar can be drawn from this case.   The act was one which, without the statute, was legal.   It was made a misdemeanor by the statutes, and hence became what Lord Chief Justice Coleridge said the defendants' acts were not in the Mogul Case.   It may be said, in passing, that there is no such statute in this state.

Judd v. Harrington (N. Y. App.) 34 N. E. 790, was an action to en-

force an illegal contract, by the parties to it.    It is, therefore, in the category of California cases supra.

Of U. S. v. Jellico Mountain, etc., Co., 46 Fed. 432, so far as we are concerned with it, it is only necessary to say that it was an action to enjoin defendants from unlawfully continuing to restrain interstate commerce in coal at Nashville, contrary to the provisions of the anti-trust law of 1890.    The petition was filed against the Nashville Coal Exchange, under the authority of section 4 of the act, for violations of sections 1 and 2, by which every contract or combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, is declared illegal, and "every person who shall monopolize, or combine, or conspire with another person or persons to monopolize any part of the trade or commerce among the several states * * * shall be guilty of a misdemeanor."    In other words, the statute made the combination not only a crime, but gave a civil action in equity to the United States to restrain violations of the statute.    The case is obviously not similar to the one at bar.

State v. Donaldson, 32 N. J. Law, 152, was a criminal action, and the decision of the court was made on motion to quash the indictment. The indictment alleged that the defendants and divers other evil-disposed persons, etc., being journeymen workingmen employed by Richmond Ward, John C. Little, and others, who were then and there engaged together in the manufacture of patent leather, and as carriers, maliciously to control, injure, terrify, and impoversh their said employers, and force and compel them to dismiss from their said employment certain persons, to wit, Charles Briggan and William Pendergast, then and there retained by their said employers as journeymen and workmen for them, and to injure said Charles Briggan and William Pendergast, unlawfully did conspire, combine, confederate, and agree together to quit, leave, and turn out from their said employment until and unless the said last-mentioned journeymen and workmen should be dismissed by their said employers; and the indictment further charges that they did quit and remain away until their demand was complied with.    The decision was undoubtedly based on the malicious character of defendants' acts, these having no just cause or excuse, being of no benefit to defendants, and oppressive to those against whom they were directed; and it is so quoted by Judge Taft in Toledo, A. A. & N. M. R. Co. v. Pennsylvania Co., 54 Fed. 734.    If not so based, it is opposed to other cases.    This element was recognized in the Mogul Case, supra, as raising different questions from acts induced by a benefit to the doer.    Lord Justice Bowen said (23 Q. B. Div. 613; quoting the case of Rogers v. Dutt, 13 Moore, P. C. 209), to make conduct actionable as a tort, it is not enough "that it will, however, directly do a man harm in his interests," and, continuing, said:

"What, then, were the rights of the plaintiffs, as traders, as against the defendants? The plaintiffs had a right to be protected against certain kinds of conduct, and we have to consider what conduct would pass this legal boundary. Now, intentionally to do that which is calculated, in the ordinary

course of events, to damage, and which in fact damages, another, in that other person's property or trade, is actionable, if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is what the law calls a 'malicious wrong.' "

See Bromage v. Prosser, 4 Barn. & C. 247; Bank v. Henty (per Lord Blackburn) 7 App. Cas. 741, at page 772.

So Judge Taft said in his very able opinion in Toledo, A. A. & N. M. R. Co. v. Pennsylvania Co., 54 Fed. 738, such combinations are said to be unlawful conspiracies, though the acts, in themselves, and considered singly, are innocent, when the acts are done with malice, i. e. with intention to injure another without lawful cause. Whether, in the pending case, the defendants' acts have just cause or excuse, will be considered hereafter.

State v. Glidden, 55 Conn. 46, 8 Atl. 890, was a criminal action for conspiracy, based on a state statute which provided as follows:

"Every person who shall threaten and use any means to intimidate any person to compel him to do or abstain from doing any act which he has a legal right to do, or shall injure or threaten to injure his property with intent to so intimidate him shall be liable to a fine not exceeding one hundred dollars, or imprisonment in the county jail six months."

The information fully charged threats, intimidation, and boycott; and, applying it, the court said:

"Do the acts which it is alleged the defendants conspired to do fall within the prohibition of the act of 1878? They proposed to threaten and use means (to boycott) to intimidate the Carrington Publishing Company to commit, against its will, to abstain from doing an act (to keep in its employ workmen of its own choice) which it had a legal right to do, and to do an act (employ the defendants and such persons as they should name) which it had a legal right to abstain from doing. There can be but one answer to the question,— the acts proposed are clearly prohibited by the statute."

The court could have stopped there, as the court said it could have, but, as the argument had taken a wide range, it considered and stated the law of criminal conspiracy, and said:

"If we were to attempt to give a rule applicable to this branch of the subject, we should say that it is a criminal offense for two or more persons, corruptly or maliciously, to confederate and agree together to deprive another of his liberty or property. Such a rule is proximately correct and practically just." "Now, if we look at this transaction as it apears on the face of this information, we shall be satisfied that the defendants' purpose was to deprive the Carrington Publishing Company of its liberty to carry on its business in its own way, although in doing so it interfered with no right of the defendants. The motive was a selfish one,—to gain an advantage unjustly, and at the expense of others,—and therefore the act was legally corrupt. As a means of accomplishing the purpose, the parties intended to harm the Carrington Publishing Company, and therefore it was malicious."

Without concurring with or dissenting from the comments or conclusions from the rule the learned court applied, it is sufficient to say, besides what has been said, that the facts of the case, as well as those of the cases of Sinsheimer v. United Government Workers (Sup.) 26 N. Y. Supp. 152, and Carey v. Typographical Union, 45 Fed. 135, distinguish it and them from the case at bar, in some of the charges; and whether in all, we shall consider hereafter. In all of them the acts complained of were not acts of the

defendants, directly, in relation to the plaintiffs, but acts influencing, or of intimidation and threats against, the customers of the plaintiffs,—not acts which the defendants might lawfully do or not do, but acts, it may be, of violence, constraining the will of others, and forcing obedience by threats. In other words, the defendants, in these cases, were strangers to the business of the plaintiffs,—intermeddled with it and harassed it.

My attention has also been directed to Queen Ins. Co. v. State (Tex. Civ. App.) 22 S. W. 1048, notwithstanding it was reversed on appeal. The combination complained of in that case, like the one in the case at bar, was of insurance companies, and for not dissimilar purposes. The suit was by the attorney general of the state, under a statute of the state, or rather supposed statute. The statute was held inoperative, but the action was sustained, nevertheless, the lower court saying that "it is too plain for argument that the purposes and objects of the organization sued are hateful and injurious to the public." The case, as I have said, was reversed on appeal; the court holding that the organization was not in "restraint of trade," as these words are defined at common law, and was not unlawful. The decision is elaborate, and carefully reviews the whole subject. A distinction is made, and asserted to have been recognized at common law, between articles of prime necessity and others, as affecting and distinguishing combinations to secure a monopoly in them. This distinction is criticised by counsel as narrow and arbitrary. I am not sure that the distinction is more arbitrary or narrow than others which the law makes, and necessarily makes. But it is not necessary to say. It is enough for the present purpose to remark that the case has an important distinction from the case at bar. It was a suit by the attorney general, in the name of the state, directly against the organization, and the lower court found warrant for it in the laws and constitution of the state, and not a suit of a private individual, which is governed by other considerations, as I have shown. If, however, the reasoning of the lower court be considered broad enough to cover a suit by a private individual, it cannot be considered authority, as against its reversal by the court of appeals, or the other cases which I have cited. Queen Ins. Co. v. State, (Tex. Civ. App.) 22 S. W. 1048.

It will be observed that all the cases regard the motive as important, as determining the absence or presence of malice.

The bill in this case alleges that:

"The Board of Fire Underwriters of the Pacific is an association and combination whereof the above-named defendants are the active members, agents, and officials, designed to coerce your orator, and others transacting business of a like character, * * * to interfere with, obstruct, vex, or annoy your orator, its employés and assureds, * * * with a view to induce your orator, its employés and agents, * * * to become members of said board, and * * * designed to interfere with your orator's perfect freedom of action, * * * dictate the terms upon which the business of your orator shall be conducted, by means of threats of injury or loss, as hereinafter set forth."

And in the tenth paragraph of the bill it is alleged "that the said board and defendants, with its associates, or some or any two

or more of them, have entered into a conspiracy to prevent your orator from following his aforesaid lawful business," etc.

I shall assume that by these allegations the plaintiff intends to charge that the board was organized, and a conspiracy was formed, for the purposes mentioned. If the charges were true, there could be no doubt about the judgment which should follow them. But I do not think the proof sustains them. I do not think the board was organized or formed for such purposes. It was induced by trade reasons, in which the co-operation of all companies was undoubtedly desired; and necessarily, against their opposition, a plan of competition was provided for and executed. It would be extremely inconsequential to say that the organization had no other purpose, or had the chief purpose to intermeddle with plaintiff's business, or compel its action in any way, or was influenced by personal malice or ill will. We hence come to the consideration · of the means employed by defendant. Did they transcend the bounds of a competition "waged [by the defendant] in the interest of their own trade"? Beginning this head of inquiry, it may be said "it is not enough" (as Lord Chief Justice Coleridge said) "that the combination be unlawful. There must be damage to the plaintiff before an action will lie." And, as he further observed, "damage means legal injury. Mere loss or disadvantage will not sustain the action." And Lord Justice Bowen said, "It is the damage wrongfully done, and not the conspiracy, that is the gist of the action on the case for conspiracy." Chief Justice Nelson, speaking for the court in Hutchins v. Hutchins, 7 Hill, 107, said, "A simple conspiracy, however atrocious, unless it resulted in actual damage to the party, never was the subject of a court action, not even when the old form of a writ of conspiracy, in its limited and most technical character, was in use." The language and doctrine is quoted and approved in Herron v. Hughes, 25 Cal. 555. In Bowen v. Matheson, 96 Mass. 502, Justice Chapman said: "The gist of the plaintiff's action is not the conspiracy alleged, or the declaration, but the damage done to the plaintiff by the alleged acts of the defendants, and the averment that the acts were done in pursuance of a conspiracy does not change the nature of the action. Parker v. Huntington, 2 Gray, 124. In order to be good, the declaration must allege against the defendant the commission of illegal acts." The conclusion from these cases is, there must be damage done by illegal means. For a board company to dismiss its agent, because an agent of the plaintiff, or to put him to an election of service, is not an illegal act; nor can a court of equity restrain it, if done (and I need go no further than this) without malice. The same comment may be made on the act of any such company in placing or refusing to place insurance for plaintiff or its customers. Neither act is a naked transgression against plaintiff. Obviously, many trade reasons induce it.

The act of Rucker & Co., as agents for certain of the board companies, advertising that they had authority to cancel policies of plaintiff's companies and certain other nonboard companies, I am inclined to think, is within the prohibition of the cases. It is

claimed, however, it was a competitive retaliation for the act of the agent of the Continental in cutting rates and soliciting the owners of a store in San José, called the "City Store," to cancel the policies of the board companies represented by said Rucker & Co. But the advertisement exceeds proper competition, and advertises to the public that which is not true, to wit, that said Rucker & Co. had the right to cancel policies issued by plaintiff.

The acts of defendant, at Salt Lake, threatening certain agents and customers of plaintiff, are unlawful; nor were they attempted to be justified by defendant's counsel. The charge was attempted to be met by affidavits of agents of certain board companies that they had not made, and did not know of any one who had made, threats, or had heard of threats. This is not a very satisfactory denial of acts so inimical and unjustifiable. I think, therefore, the restraining order should be continued, as to them. It is only just, however, to say that the president of the board and the defendants positively deny that they have issued threats of any kind against anybody, or that threats have been issued by their consent and knowledge. Injunction continued, as herein indicated,—that is, against the advertisements at San José, or like advertisements elsewhere, and against acts at Salt Lake, and like acts elsewhere,— and in all other particulars it is dissolved.