UNITED STATES v. ADDYSTON PIPE & STEEL CO. et al.

(Circuit Court, E. D. Tennessee, S. D. February 5, 1897.)

1. ANTI-TRUST ACT—INTERSTATE COMMERCE.
    The act of congress of July 2, 1890, commonly known as the "Anti-Trust Act," does not, and could not constitutionally, affect any monopoly or contract in restraint of trade, unless it interferes directly and substantially with interstate commerce, or commerce with foreign nations.

2. SAME.
    Where several corporations engaged in the manufacture of cast-iron pipe formed an association whereby they agreed not to compete with each other in regard to work done or pipe furnished in certain states and territories, and, to make effectual the objects of the association, agreed to charge a bonus upon all work done and pipe furnished within those states and territories, which bonus was to be added to the real market price of the pipe sold by those companies, this combination was not a violation of the anti-trust act, as it affected interstate commerce only incidentally.

3. SAME.
    In the examination of such a contract, fraud and illegality are not to be presumed, but must be proved, as in all other cases.

4. SAME.
    In a suit such as this, in the name of the United States, jurisdiction depends alone upon the act; and the court is concerned with no case between private persons or corporations, where jurisdiction depends on other conditions, and in which proceeding a common-law remedy might become available.

James H. Bible, for complainant.
Brown & Spurlock and W. E. Spears, for defendants.

CLARK, District Judge.   This suit is brought on behalf of and in the name of the United States against six named corporations.   The state of creation and the chief place of business of the several defendants are as follows:   Addyston Pipe & Steel Company, Cincinnati, Ohio.   Dennis Long & Co., Louisville, Ky.   Howard-Harrison Iron Company, Bessemer, Ala.   Anniston Pipe & Foundry Company, Anniston, Ala.   South Pittsburg Pipe Works, South Pittsburg, Tenn. Chattanooga Pipe & Foundry Works, Chattanooga, Tenn.   The petition charges that the defendants are practically the only manufacturers of cast-iron pipe within the following states and territories: Alabama, Arizona, California, Colorado, North Dakota, South Dakota, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Indian Territory, North Carolina, South Carolina, New Mexico, Minnesota, Michigan, Tennessee, Texas, Illinois, Wyoming, Indiana, Ohio, Utah, Washington, Oregon, Iowa, West Virginia, Nevada, Oklahoma, and Wisconsin.   It is further charged upon information that the defendants, in order to monopolize the trade in cast-iron pipe in the above-named states and territories, entered into a contract or association known as the Associated Pipe Works; that the purpose of the association was to destroy all competition within said territory, and to force the public to pay unreasonable prices for the cast iron pipe manufactured and sold by said companies; that for such purposes each company selected a representative; and that these representatives constituted an executive committee.   It is charged that the defendants, by the terms of said association, agreed not to compete with each other in regard to work done or pipe furnished in the states and territories above named, and, to make effectual the objects of the association, a bonus was agreed to be charged upon all work done and pipe furnished within said territory, and the petitioner charges that this bonus was put upon the real market price of the pipe sold by these companies, and, to that extent, increased the price to the purchasing public; that the amount of this bonus ranged from $3 to $9 per ton; that the purpose of the association was thus to force up the price of cast-iron pipe to an exorbitant and unreasonable extent.   It does appear from the bill, as well as the answer and the proof, that upon what may be called "stock goods," regularly sold, there is a fixed bonus, and that upon goods supplied by special contract the bonus is determined as follows: When bids are advertised for by any municipal corporation, water company, or gas company, the executive committee determines the price at which the bid is to be put in by some company in the association, and the question to which company this bid shall go is settled by the highest bonus which any one of the companies, as among themselves, will agree to pay or bid for the order.   When the amount is thus settled the company to whom the right to bid upon the work is assigned sends in its estimate or bid to the city or company desiring pipe, and the amount thus bid is "protected" by bids from such of the other members of the association as are invited to bid, and by the bidding in all instances being slightly above the one put in by the company to whom the contract is to go.   There are within the 36 states and territories what are called "reserved cities," by which it is

agreed that particular members of the association shall have the work at particular cities, and on this they pay the regular bonus, just as on stock goods when sold otherwise than by special contract obtained by bidding. It appears, too, that by far the larger part of the work done with goods furnished by these companies is under special contract with municipal corporations and gas and water companies, as above stated. Practically, all the profitable business is thus done. The general public, so far as affected by the business at all, is affected mainly through municipal corporations. All of the states of the United States outside of the states and territories above named are called "free territory," and the states named are distinguished as "pay territory." Settlements are made at stated times of the bonus account debited against each company, where these largely offset each other, so that small sums are in fact paid by any company in balancing accounts.

The aggregate annual manufacturing capacity of the 6 companies belonging to the association is 220,000 tons, with a daily capacity or output of about 650 tons; there are 9 other companies or corporations engaged in the manufacture and sale of cast-iron pipe within the pay territory, with an aggregate daily capacity of about 835 tons, though most of these are small concerns; and there are 10 companies or corporations engaged in the same business located within the free territory, as above explained, with a daily capacity or output of, say, 1,550 tons. It appears, also, that members of the Associated Pipe Works, while they do not compete with each other, are subjected to competition by the other companies and corporations, both within and without the pay territory, though just to what extent and with what effect this competition is carried on does not clearly appear. It does appear, however, sufficiently, that the companies within the association have so far not been able to raise or maintain prices above what is reasonable, compared with the prices at which similar goods and similar work may be obtained from the companies outside of the association. It now appears that all corporations, with one or two unimportant exceptions, which have let contracts to the members of this association, are satisfied with the prices, and make affidavit to the fact that they are reasonable, and that the prices furnished are, in the main, considerably below the estimates made by the expert engineers of such companies prior to advertising for the bids. The proof shows, too, that the defendant companies have, at least in certain instances, made quotations on goods to be delivered in the free territory below corresponding prices within the pay territory. It is said by the defendants that this is explained by reason of the difference in the cost of goods manufactured under contracts obtained by bidding, and stock goods which are sold on general orders, and consisting of goods which have been rejected as not coming up to the specifications, and goods manufactured during the winter season in order to keep men and machinery from becoming idle, during which period there is practically no demand by companies which purchase goods on special orders, and contract by bids.

I think it does sufficiently appear that the average prices obtained by this association since its formation are above what was obtained before, though, as above stated, the proof is not sufficient to show that the ruling prices are now above what is reasonable, as determined in the markets and by competition. The defendants, in their answer, deny the purpose attributed to the association by the plaintiff's petition. On the contrary, they say and set up that prior to the association they were engaged in reckless and ruinous competition among themselves, as a result of which their business was not prosperous, and under which condition of things it was certain that some or all of them would fail and leave the entire field to such as might be able to survive. It is set up that what is called the "bonus" does not affect the price to the purchaser at all, but that the association determines in the first place what the market price should be, having regard also to the competition to which it is likely to be subjected by other companies not in the association, and that the price is not at any time unreasonable, and that the bonus is merely a mode of determining as between themselves, to an extent, who shall secure the work, but chiefly to make it certain that each company does its fair share of the business, by making the bonus burdensome to such companies as might undertake to do more than their reasonable share of the business within the territory named. It is further said that under the association the business has been fairly divided between the companies, and that they have been enabled to keep all of the plants in operation, their operatives at work, and the machinery from becoming idle. I think it could be safely stated that in some instances prices have been above what was probably fair or reasonable, but the proof fails to show that the average prices have been so. The leading witness for the government was for some time a stenographer in the service of the defendant Chattanooga Foundry & Pipe Works, and in that position did the work of the association, became familiar with all of the details by which the business was conducted, and, after giving up his position, made known to the government's law officer all the facts of the case, and has persistently and industriously corresponded with persons who had dealings with members of the association, and has done all in his power to instigate suits by purchasers from these companies against the associated companies, and has offered to become a witness in their behalf in such suits; always making the condition that he was to be liberally compensated, exacting generally a very large per cent. of what might be recovered. A complete exposure of all the business details of these companies has been thus made. So far, he has not been able to cause any suit. to be instituted. But, upon the facts laid before him, the district attorney, under the direction of the attorney general, instituted the present suit. It was certainly eminently proper, in view of the disclosures made to the district attorney, that suit should be brought, and an investigation had.

This suit is based upon the act of July 2, 1890, "to protect trade and commerce against unlawful restraints and monopolies," com-

monly called the "Anti-Trust Act" (26 Stat. 209, c. 647; Supp. Rev. St. p. 762). Such of the provisions of the act as affect the matter now under consideration are as follows:

"Section 1. Every contract, combination in the form of trust, or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor.

"Sec. 2. Every person who shall monopolize or attempt to monopolize or combine to conspire with any other person or persons, to monopolize any part of the trade or commerce among several states, or with foreign nations, shall be deemed guilty of a misdemeanor."

"Sec. 4. The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act."

When the petition was filed, a restraining order was allowed, and the case is now heard upon the application for a preliminary injunction. The discussion on this motion has taken a wide range, and has proceeded upon the basis that the entire case has been practically developed as much as could be done upon full preparation and a final hearing. The record, so far as made up, consists of the petition, answer, affidavits, and exhibits thereto. A demurrer is incorporated in the answer of the defendants, and the defense rests upon two grounds: (1) That the association is not one subject to the provisions of the act of congress, to enforce which alone this suit is brought; and (2) that the association, in its purposes and mode of doing business, does not constitute a monopoly, and causes no restraint of trade, such as would be unlawful at the common law. It will depend upon the solution of the first question made as to whether or not it will become necessary to examine the second. The question whether this is an association such as subjects it to the provisions of the act of congress is one of some difficulty. This act, like what is known as the "Interstate Commerce Act," is new and experimental legislation by congress. The discussion which attended the passage of the act by congress, as shown by the records, makes it plain that the ablest and most thoughtful jurists of that body experienced much of the same difficulty which has since been felt by the courts in the attempt to enforce the act. It was recognized that congress was restricted in anything that it might do upon the particular subjects named in the act to a very narrow field; that the constitutional validity of the legislation was doubtful as a whole. Up to the date of the enactment of the interstate commerce law, and of the act now under consideration, the interstate commerce clause of the constitution, under which legislation of this character is justified, has been considered by the courts almost entirely with relation to state legislation, and its constitutional validity. Nevertheless it will be profitable to refer briefly to the doctrine announced in some of these cases before making any more particular reference to cases in which this act has been considered. It has, of course, been recognized from the beginning that it was no more within the province of congress to legislate upon domestic commerce, or commerce wholly within a state, than it was within the power of the legislature of a state to legislate upon the subject of interstate commerce or trade. In Nathan v. Louisiana, 8 How. 73, a tax was

imposed on every money or exchange broker, and this legislation was objected to upon the ground that the sole business of the defendant in that case was the buying and selling of foreign bills of exchange, which were instruments of commerce, and the act was repugnant to the constitutional power of congress to regulate commerce with foreign nations and among the several states. It was admitted by the court that foreign bills of exchange were instruments of commerce, but the court also said, in effect, that the products of agriculture or manufacture were in like manner instruments of commerce. Mr. Justice McLean, giving the opinion of the court, said:

"He is not engaged in commerce, but in supplying an instrument of commerce. He is less connected with it than the shipbuilder, without whose labor foreign commerce could not be carried on."

The court further pointed out that domestic bills or promissory notes were as necessary to the commerce of a state as foreign bills were to the commerce of the Union. In the State Freight Tax Cases, 15 Wall. 272, the court observed:

"The transportation of articles of trade from one state to another was the prominent idea in the minds of the framers of the constitution, when to congress was committed the power to regulate commerce among the several states. A power to prevent embarrassing restrictions by any state was the thing desired."

In Railroad Co. v. Richmond, 19 Wall. 584, a contract had been entered into between the Dubuque & Sioux City Railway Company and the Dubuque Elevator Company, both created corporations by the laws of Iowa, by the terms of which contract, among other things, the elevator company was to erect an elevator on land leased from the railroad company, to be situated at Dubuque, for the purpose of receiving, storing, delivering, and handling all grain that should be received by the cars of the railroad company, not otherwise consigned, and to receive and discharge at Dubuque, for the company, all "through grain" by which was meant grain transported, by the terms of shipment, through that place to points beyond, at a certain stated price per bushel. The railroad company stipulated on its part that it would not erect a similar building for receiving, storing, or delivering grain at Dubuque, and would not lease to any others the right to erect any such building; that the elevator company should have the exclusive right to handle all through grain at Dubuque at the stipulated price per bushel. The railroad company having leased its road and property to the Illinois Central Railroad Company, the latter company disregarded the contract; and suit was brought in the United States court to enforce the same on behalf of the elevator company, and the defense was that the contract was repugnant to the constitution, as violating the interstate commerce clause. This defense was overruled, and decree entered in favor of the elevator company, and the case was taken to the supreme court of the United States. The ruling of the lower court was affirmed, and the supreme court, in doing so, enunciated again the controlling rule upon this subject, by saying:

"The power to regulate commerce among the several states was vested in congress in order to secure equality and freedom in commercial intercourse against discriminating state legislation. It was never intended that the power should be

exercised so as to interfere with private contracts not designed at the time they were made to create impediments to such intercourse."

In Sherlock v. Alling, 93 U. S. 100, a statute of the state of Indiana was drawn in question. This statute contained provisions designed for the better security of the lives of the passengers on board vessels propelled in whole or in part by steam, and the contention was that, as applied to marine torts, the act was invalid, as interfering with the exclusive regulation of commerce vested in congress. Mr. Justice Field, discussing this point and referring to previous decisions, used the following language:

"In supposed support of this position, numerous decisions of this court are cited by counsel, to the effect that the states cannot, by legislation, place burdens upon commerce with foreign nations, or among the several states. The decisions go to that extent, and their soundness is not questioned. But, upon an examination of the cases in which they were rendered, it will be found that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles, as between particular places, was required to be conducted. In all the cases the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuit in particular channels, or conditions for carrying it on. Thus, in the Passenger Cases, 7 How. 445, the laws of New York and Massachusetts exacted a tax from the captains of vessels bringing passengers from foreign ports, for every passenger landed. In the Wheeling Bridge Case, 13 How. 518, the statute of Virginia authorized the erection of a bridge which was held to obstruct the free navigation of the river Ohio. In the case of Sinnot v. Davenport, 22 How. 227, the statute of Alabama required the owner of a steamer navigating the waters of the state to file, before the boat left the port of Mobile, in the office of the probate judge of Mobile county, a statement, in writing, setting forth the name of the vessel, and of the owner or owners, and his or their place of residence and interest in the vessel, and prescribed penalties for neglecting the requirement. It thus imposed conditions for carrying on the coasting trade in the waters of the state, in addition to those prescribed by congress. And in all the other cases where legislation of a state has been held to be null for interfering with the commercial power of congress, as in Brown v. Maryland, 12 Wheat. 425, State Tonnage Tax Cases, 12 Wall. 204, and Welton v. Missouri, 91 U. S. 275, the legislation created, in the way of tax, license, or condition, a direct burden upon commerce, or in some way directly interfered with its freedom."

And in the further progress of the opinion the court observed:

"In conferring upon congress the regulation of commerce, it was never intended to cut the states off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the constitution."

It will be readily seen that the cases recognize the distinction between the subjects of commerce and commerce itself, as well as between the instruments and aids to such commerce, and the actual business of commerce. In regard to state legislation, it has been declared from the beginning that, to render such legislation subject to constitutional objection under the commerce clause, the effect of the legislation upon interstate commerce must be direct, and not incidental or indirect. This general statement of the law so often repeated has been illustrated by the varying facts of many cases, but it would extend this opinion beyond reasonable limits to now refer to

these. It has often been observed that the line of demarkation between state and federal jurisdiction and regulation is a delicate one, and at times grows dim and shadowy. In considering a question of this delicate nature, proper and practical distinctions become extremely important. A particular business must be distinguished from the mere subjects of the business, and from mere incidents to or instruments by which the business is carried on. It is hardly conceivable that any large industrial or manufacturing establishment could be carried on without shipping products from one state to another, and such would certainly be the course of business contemplated. Nevertheless the business of such an establishment would be related to interstate commerce only incidentally and indirectly. Commerce would not be the main business, nor within the main purpose of the ordinary manufacturing establishment. Interstate commerce would be altogether an incident. There is no direct relation between the two. It is probably true that every wholesale establishment within the limits of the larger cities is engaged in such mode of business as that it is known that the business can be conducted only by the method of interstate commerce in part. Such commerce is, however, not directly affected, and least of all impeded or restricted. If every private enterprise which is carried on in part or chiefly by interstate shipments, or by a mode of business which makes this necessary, is to be regarded as thereby so related to interstate commerce as to come within the regulating power of congress, it is obvious that this power could at once be extended to almost every form of business in the country which is conducted on anything like an extensive scale. So liberal an interpretation as this would obviously, in a large sense, obliterate the lines between federal and state jurisdiction, and, as an act of congress is paramount in authority, would strike down the autonomy of the states. The doctrine applicable to this subject was thoughtfully and fully restated by Mr. Justice Lamar in Kidd v. Pearson, 128 U. S. 120, 9 Sup. Ct. 10, in language as follows:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce. Manufacture is transformation,—the fashioning of raw materials into a change of form, for use. The functions of commerce are different. The buying and selling, and the transportation incidental thereto, constitute commerce, and the regulation of at least such transportation. If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, or the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in congress and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests,—interests which, in their nature, are and must be local in all the details of their successful management. The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable, and utterly inconsistent. Any

movement towards the establishment of rules of production in this vast country, with its many different climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement towards the local, detailed, and incongruous legislation required by such interpretation would be about the widest possible departure from the declared object of the clause in question. Nor this alone. Even in the exercise of the power contended for, congress would be confined to the regulation, not of certain branches of industry, however numerous. but to those instances in each and every branch where the producer contemplated an interstate market. These instances would be almost infinite, as we have seen; but still there would always remain the possibility, and often it would be the case, that the producer contemplated a domestic market. In that case the supervisory power must be exercised by the state, and the interminable trouble would be presented, that whether the one power or the other should exercise the authority in question would be determined, not by any general or intelligible rule, but by the secret and changeable intention of the producer in each and every act of production. A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the states, and less likely to have been what the framers of the constitution intended, it would be difficult to imagine."

The distinction before referred to between commerce and the subjects of commerce, and between the direct and indirect effect of the business, or mode of doing business, upon interstate commerce, is here clearly recognized and declared, as was also done in U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, in which the opinion in Kidd v. Pearson is expressly referred to, and the ruling reaffirmed. It was easy to anticipate that, when called upon to enforce the provisions of the anti-trust act, the interpretation would be in harmony with the construction of the commerce clause which had been uniformly given in considering state enactments alleged to infringe, or supposed to be an infringement upon, this provision of the constitution. In re Greene, 52 Fed. 104–119, is the first case in which the act in question was extensively treated. The question arose upon a petition for a writ of habeas corpus. The defendants and others, under the form of what was called the Distilling & Cattle-Feeding Company, a corporation organized under the laws of Illinois, had obtained possession and authority over such a number of distilleries that the company controlled the manufacture and sale of 75 per cent. of all distillery products in the United States, and the defendants had fixed the price at which the purchasers should and did sell the products of the distilleries. Sales were made through agencies established in Massachusetts and other places, and one of the questions considered was whether this was a combination subject to the provisions of the anti-trust act, under which the defendant had been indicted, and Judge Jackson (afterwards Mr. Justice Jackson) ruled that it was not. Discussing the point of whether the whisky trust was subject to the act, the eminent judge observed:

"It is certain that congress could not, and did not by this enactment, attempt to prescribe limits to the acquisition, either by the private citizens or state corporation, of property which might become the subject of interstate commerce, or declare that, when the accumulation or control of property by legitimate means and lawful methods reached such magnitude or proportions as enabled the owner or owners to control the traffic therein, or any part thereof, among the states, a criminal offense was committed by such owner or owners. All persons, individually or in corporate organizations, carrying on business avocations and enterprises involving the purchase, sale, or exchange of articles, or the production and

manufacture of commodities which form the subjects of commerce, will, in a popular sense, monopolize both state and interstate traffic in such articles or commodities, just in proportion as the owner's business is increased, enlarged, and developed. But the magnitude of a party's business, production, or manufacture, with the incidental and indirect powers thereby acquired, and with the purpose of regulating prices and controlling interstate traffic in the articles or commodities forming the subject of such business, production, or manufacture, is not the monopoly, or attempt to monopolize, which the statute condemns." 52 Fed. 115.

And, speaking somewhat more specifically, it was further said:

"It was certainly not a 'monopoly,' in the legal sense of the term, for the accused or the distilling and cattle-feeding company to own seventy distilleries and the products thereof, whether such products amounted to the whole or a large part of what was produced in the country. Their ownership and control of such products, as subjects of trade and commerce, is not what the statute condemns, but the monopoly or attempt to monopolize the interstate trade or commerce therein. In this acquisition and operation of the seventy distilleries, which enabled the accused or said distilling and cattle-feeding company to manufacture and control the sale of 75 per cent. of the distillery products of the country, it does not appear, nor is it alleged, that the persons from whom said distilleries were acquired were placed under any restraint, by contract or otherwise, which prevented them from continuing or re-engaging in such business. All other persons who chose to engage therein were at liberty to do so. The effort to control the production and manufacture of distillery products by the enlargement and extension of business was not an attempt to monopolize trade and commerce in such products, within the meaning of the statute, and may therefore be left out of further consideration."

Much of the discussion in the opinion is devoted to showing that the trust arrangement there considered was neither a monopoly nor a contract in restraint of trade, according to the common-law sense, which it was held, in that and subsequent cases, must be allowed to settle the question of what is a monopoly or contract in restraint of trade, in the absence of any definition in the act of congress.    In the previous case of In re Terrell, 51 Fed. 215, Judge Lacombe had declared that:

"It is not the actual restraint of trade (if such be restraint of trade) that is made illegal by the statute, but the making of a contract in restraint of trade,—of a contract which restrains, or is intended to restrain, trade."

The statute came before the supreme court of the United States for the first time in U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249. The American Sugar-Refining Company, a corporation existing under the laws of the state of New Jersey, being in control of a large majority of the manufactories of refined sugar in the United States, acquired, through the purchase of stock, four other refineries in Philadelphia, and thus obtained such disposition over these refineries throughout the United States as gave it a practical monopoly of the business, and it was held that the result of the transaction was the creation of a monopoly in the manufacture and sale of a necessary of life; but it was nevertheless distinctly held that the monopoly was not one which could be suppressed under the provisions of the act of congress now in question, and that the business of sugar refining in Pennsylvania bore no direct relation to commerce between the states, nor with foreign nations.    And the doctrine upon this subject, and the distinctions before adverted to, which pervade all of the previous cases, are again declared in the opinion with great clearness.    Mr. Chief Justice Fuller, speaking for the court, said:

78 F.—46

"The argument is that the power to control the manufacture of refined sugar is a monopoly over a necessary of life, to the enjoyment of which by a large part of the population of the United States interstate commerce is indispensable, and that, therefore, the general government, in the exercise of the power to regulate commerce, may repress such monopoly directly, and set aside the instruments which have created it. But this argument cannot be confined to necessaries of life merely, and must include all articles of general consumption. Doubtless the power to control the manufacture of a given thing involves, in a certain sense, the control of its disposition, but this is a secondary, and not the primary, sense; and, although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. The power to regulate commerce is the power to prescribe the rule by which commerce shall be governed, and is a power independent of the power to suppress monopoly. But it may operate in repression of monopoly whenever that comes within the rules by which commerce is governed, or whenever the transaction is itself a monopoly of commerce. It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed, for, while the one furnishes the strongest bond or union, the other is essential to the preservation of the autonomy of the states, as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne, than the risk be run, in the effort to suppress them, of more serious consequences, by resorts to expedients of even doubtful constitutionality. It will be perceived how far-reaching the proposition is that the power of dealing with a monopoly directly may be exercised by the general government whenever interstate or international commerce may be ultimately affected."

After referring with approval to Gibbons v. Ogden, 9 Wheat. 1, 210, Brown v. Maryland, and other previous cases, the opinion was concluded by saying:

"It was in the light of well-settled principles that the act of July 2, 1890, was framed. Congress did not attempt thereby to assert the power to deal with monopoly direct, as such; or to limit and restrict the rights of corporations created by the states, or the citizens of the states, in the acquisition, control, or disposition of property; or to regulate or prescribe the price or prices at which such property, or the products thereof, should be sold; or to make criminal the acts of persons in the acquisition and control of property which the states of their residence or creation sanctioned or permitted. Aside from the provisions applicable where congress might exercise municipal power, what the law struck at was combinations, contracts, and conspiracies to monopolize trade and commerce among the several states, or with foreign nations; but the contracts and acts of the defendants related exclusively to the acquisition of the Philadelphia refineries, and the business of sugar refining in Pennsylvania, and bore no direct relation to commerce between the states or with foreign nations. The subject-matter of the sale was shares of manufacturing stock; and the relief sought was the surrender of property which had already passed, and the suppression of the alleged monopoly in manufacture by the restoration of the status quo before the transfers; yet the act of congress only authorized the circuit courts to proceed by way of preventing and restraining violations of the act in respect to contracts, combinations, or conspiracies in restraint of interstate or international trade or commerce."

It is a doctrine expressly stated and clearly implied in these cases that the act of congress does not, and could not constitutionally, deal directly with a monopoly or a contract in restraint of trade, as such, according to the common-law definition of these terms; and, as has been seen, the act of congress gives no definition of its own. To do so would be clearly to trench upon the exclusive jurisdiction of the states. Federal authority exists only when a monopoly or a contract in restraint of trade assumes such form or has such effect as to go beyond any common-law conception of these terms, and interferes di-

rectly and substantially with interstate commerce or commerce with foreign nations; and this it must do directly, and not incidentally. Now, I am unable to perceive, in the light of these cases, that the act of congress can be regarded as applicable to the association under consideration. It cannot be suggested, and has not been, that this association had in contemplation as one of its purposes the subject of interstate commerce, any more than any ordinary manufacturing establishment would have, where the products of such manufactory must find a market in other states as well as in domestic markets. It seems to me evident that private gain was the object of the association, just as was observed in regard to the sugar trust in U. S. v. E. C. Knight Co. Nor does the mode in which the association conducts its business have any direct relation to interstate commerce, so far as I can see. The sugar trust was confessedly a monopoly, in the common law sense, and in a commodity of prime necessity. And the extent to which interstate commerce would be used in carrying on its business would be in magnitude out of all proportion to a similar use made by the association in question.

The learned district attorney has leveled most of his criticism at the bonus feature of the association, but it has not been pointed out, and, I think, cannot be, how the manner of using the bonus operates in restraint of interstate commerce. The object of the bonus and of the association really is not to prevent all members of the association from furnishing and shipping their manufactured products, but to determine among themselves which one of them shall do so, and it is really contemplated that some one will do so. There is certainly no restraint in this, as the supply in such case is regulated by the demand, so far as shipment is concerned. It has not been argued that the fact that certain cities are reserved to a particular company would bring the association within the provisions of the act. It is true that generally one of the reserved cities is that in which the company has its chief place of business. For example, the Chattanooga Foundry & Pipe Works is allowed, under the arrangement, to supply the cities of Chattanooga and New Orleans. If it be argued that this prevents companies in other states from shipping goods to Chattanooga, it would be merely to follow a theory having no practical bearing on the case, because, in the absence of an association, the entire freight charges being in favor of the local company, and the disposition to patronize a local concern being in its favor, it would easily furnish the supplies.

It remains to remark, as should have been done before, that upon the bill and answer, where the contract of the association is admitted in the answer, as is virtually done here, but the allegations tending to show its sinister purpose, tendencies, and effects, contained in the bill, are denied by the answer, and averments are made in the answer tending to show a just and equitable purpose and effect, the averments in such answer upon this application stand admitted, and the contract must be presumed to have been made for the purposes honestly as stated in the answer, unless the provisions of the agreement and the mode of doing business clearly show the contrary. In examination of such a contract, fraud and illegality are not to be presumed, but

must be proved as in all other cases. U. S. v. Trans-Missouri Freight Ass'n, 7 C. C. A. 15, 58 Fed. 58. It may be further observed, to prevent misconstruction, that in a suit such as this, in the name of the United States, jurisdiction depends alone upon the act giving jurisdiction to enforce its provisions, and the court is concerned with no case between private persons or corporations, where jurisdiction depends on other conditions, and in which proceeding a common-law remedy might become available. Having reached the conclusion that the defendant association is not subject to the provisions of the act of congress, according to the ruling in Re Greene and in U. S. v. E. C. Knight Co., I do not feel called upon to dispose of the other issues made in this case, and the bill is therefore dismissed.