UNITED STATES v. COAL DEALERS' ASS'N OF CALIFORNIA et al.

(Circuit Court, N. D. California. January 28, 1898.)

No. 12,539.

1. MONOPOLIES—ANTI-TRUST LAW—RESTRAINING ORDER.

Under section 4 of the anti-trust law of July 2, 1890, a restraining order may be issued without notice, under the circumstances sanctioned by the established usages of equity practice in other cases.

2. PARTIES IN EQUITY—UNINCORPORATED ASSOCIATION.

In a suit in equity to restrain an alleged unlawful combination acting as an unincorporated association, it is sufficient that the association, together with a large number of its members, as individuals and officers of the association, are made parties defendant.

3. MONOPOLIES—COMBINATIONS IN RESTRAINT OF TRADE—ANTI-TRUST LAW.

Under the anti-trust law of July 2, 1890, a contract or combination which imposes any restraints whatever upon interstate commerce is unlawful; and it is immaterial whether or not the restraint is a fair and reasonable one, or whether it has actually resulted in increasing the price of the commodity dealt in.

4. SAME—INTERSTATE COMMERCE.

Where coal is brought from other states and foreign countries to a certain city by importers and dealers, who, by a combination with a local coal dealers' association, regulate the retail prices arbitrarily, and provide against free competition, such combination is one in restraint of interstate commerce, in the meaning of the act of 1890.

In Equity.

Bill by the United States against the Coal Dealers' Association of California and the members of the association, and against Charles R. Allen, Central Coal Company, R. D. Chandler, George Fritch, J. C. Wilson & Co., Oregon Improvement Company, Oregon Coal & Navigation Company, W. G. Stafford, trading as W. G. Stafford & Co., R. Dunsmuir's Sons, John Rosenfeld, Louis Rosenfeld, and Henry Rosenfeld, partners, trading as John Rosenfeld Sons. The bill is brought to secure the dissolution of the Coal Dealers' Association of California, and to set aside an agreement between the said association and the other defendants, relating to the sale of coal in the city and county of San Francisco, alleged to be in restraint of trade and commerce, in violation of the act of July 2, 1890, and for an injunction restraining the defendants from further agreeing, combining, conspiring, and acting together in maintaining rules and regulations and rates and prices for coal brought from British Columbia, Washington, and Oregon to San Francisco, for domestic purposes as fuel.

H. S. Foote, U. S. Dist. Atty., and Alfred L. Black, Sp. Asst. U. S. Atty.

R. Y. Hayne and William Craig, for respondents Coal Dealers' Ass'n of California, Oregon Coal & Navigation Co., W. G. Stafford, and R. D. Chandler.

James T. Boyd and W. H. Fifield, for respondent R. Dunsmuir's Sons.

W. S. Goodfellow, for respondents Central Coal Co., John Rosenfeld, Louis Rosenfeld, and Henry Rosenfeld, partners trading as John Rosenfeld Sons.

John A. Wright and George R. Lukens, for respondents J. S. Wilson & Co.

T. C. Coogan, for respondents Charles R. Allen and George Fritch.

MORROW, Circuit Judge. This is a bill in equity, brought by the United States attorney, upon the authority of the attorney general, in

the name of the United States, against the Coal Dealers' Association of California and the members of the association and certain firms and corporations doing business in San Francisco, for the purpose of dissolving the Coal Dealers' Association, as an unlawful combination, and to set aside an agreement between the said association and the other defendants, alleged to be in restraint of trade and commerce, in violation of the act of congress entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890. It is alleged in the bill that the Coal Dealers' Association and the officers and members thereof are an unincorporated organization, composed of retail dealers in coal, residents in the city of San Francisco, and of miners and shippers of coal, who are residents of and are carrying on business in the city of San Francisco; that R. Dunsmuir's Sons are the agents and largely interested in and control and import coal from the Wellington colliers of British Columbia, from which comes a large part of the coal shipped from British Columbia; that R. D. Chandler is a wholesale coal dealer in the city of San Francisco, and imports and brings and deals in and sells coal brought from the state of Washington; that J. C. Wilson & Co. deal in coal brought from British Columbia; that the Oregon Coal & Navigation Company own coal mines in the state of Oregon, and import and bring coal to the state of California from said mines, and sell the same at wholesale; that W. G. Stafford & Co. import and bring coal from the state of Oregon; that the defendants and their associates comprise all the wholesale dealers who handle, bring, and import, and sell coal, used in San Francisco for domestic purposes as fuel; and that the said defendants, combined together, can absolutely control the price charged for coal for domestic purposes as fuel at said city of San Francisco, by reason of the fact that San Francisco is located at such a distance from all coal mines, other than those controlled by the defendants, that the rates of transportation are prohibitory, and make it an impossibility to import or bring coal as fuel for domestic purposes from any place or places or mines other than the mines owned, operated, and controlled by the defendants, or some of them; that all the coal mined in the state of California that is used as fuel in said San Francisco is owned and controlled by the defendants, or some of them. The bill further alleges that the city of San Francisco is a city of 290,000 population and upward; that the inhabitants generally use coal as fuel for domestic purposes, and that it is to them one of the prime and common necessaries of life; that they use, as fuel for domestic purposes, about 800,000 tons of coal annually, of which amount more than 700,000 tons are mined in British Columbia and in the states of Oregon and Washington, and imported and brought to San Francisco; that the small percentage of about 50,000 tons is mined and produced in the state of California; and that this domestic product has no practical effect on the market price of coal in San Francisco. It is further alleged that in the year 1895 there were in the city of San Francisco divers and numerous persons engaged in the retail coal business, supplying coal as fuel for domestic purposes to the inhabitants of said city; that said coal came, in large part, through the agency of the dealers mentioned in the

bill, from British Columbia, the state of Washington, and the state of Oregon; that the retail dealers, in combination with certain wholesale dealers and importers of coal from British Columbia, and those bringing coal from the states of Washington and Oregon, and other dealers mentioned, with intent to form a contract, trust, and conspiracy in restraint of the trade and commerce between British Columbia, the state of Washington, the state of Oregon, and the state of California, and with intent to monopolize, and to attempt to monopolize, and combine and conspire to monopolize, the coal trade and commerce between British Columbia, Washington, Oregon, and California, to the extent of the coal used in the city of San Francisco as fuel for domestic purposes, did associate themselves together in the state of California, and on the 11th day of September, 1896, adopted a constitution and by-laws, the provisions of which are set out in full in the bill. For the present purpose, it will only be necessary to notice the following articles and sections:

### Constitution.

"Article 1. Title and Object. (a) The title of this organization shall be the 'Coal Dealers' Association of California,' with principal place of business in San Francisco. (b) It shall have for its object the furnishing of information to its members as to sales of coal made by wholesale dealers to the retail dealers, and by retail dealers to consumers, and also the names of any dealers who have been guilty of violating any of the rates or rules made from time to time by this organization, and the furnishing of as complete a list as possible of delinquent consumers, and such other matters as may be decided upon.

"Art. 2. What Constitutes a Dealer. (a) Any person who engages in the sale of coal as regular business, buying to sell again, who shall own and operate a yard, keeping an office, and displaying a sign, shall be regarded as a retail dealer. (b) All miners and shippers shall be eligible to membership in this association, provided such miner and shipper shall not make a practice of selling coal, at retail, at less price than the retail dealers."

"Art. 4. Fees—Dues—Assessments. (a) The admittance fee for membership shall be two hundred (200) dollars, and must invariably accompany the application. (b) The amount of dues shall be fifty cents per month, payable quarterly in advance, and to date from the first day of the month following the month in which the member was admitted. (c) Assessments may be levied by a two-thirds vote of the members present at a regular meeting, but only in such cases when the interests of this association as a business society require it. (d) No assessment shall be levied unless it is expressed in the notice of meeting that 'a resolution to levy an assessment will be introduced.'"

"Art. 6. Failure to Pay Dues, Assessments, or Fines—Charges—Right of Appeal. (a) If any member shall neglect or refuse to pay the monthly dues and assessments as provided in the constitution and by-laws of this association within three days after the same have become due, he or they shall no longer be considered members of this association, or participant in its benefits, and shall surrender certificate of membership; but a written or printed notice must be sent, at the expiration of said time, to all those members who are delinquent, and may be reinstated within ten days thereafter by paying in full all dues."

### By-Laws.

"Sec. 3. Officers and Their Duties. * * * (c) The secretary, prior to taking his office, shall be required to give a bond, for the faithful performance of his duties, in the sum of one thousand (1,000) dollars, with two sureties qualifying for the sum of five hundred (500) dollars each, and satisfactory to the board of directors. He shall collect all dues, issue all communications, notices, and other correspondence not provided for. He shall keep a register of all members of the association, together with a regular set of books for the proper conduct of business; receive all moneys due the association, and pay the same over to the treasurer; sign all orders on the treasurer for the payment of such

bills as may be approved by a majority of the finance and certificate purchasing committees. He shall keep a record, in a book provided for the purpose, of all transfers of certificates of membership; be the custodian of all properties of the association; receive all charges made of violation of the card rates and rules, and refer the same to the grievance committee for action, after using due diligence in securing such facts in the case as possible. He shall devote his entire time to the association, and under no circumstances is he allowed to be associated in any manner with any other business. He shall, on receipt of findings of the grievance committee, notify the wholesale dealers of such report, and request, in writing, that they impose the penalty for such violation. His compensation shall be fixed by the board of directors. * * *

"Sec. 4. Standing Committees. (a) A grievance committee consisting of three persons shall be appointed by the president, from the board of directors, on the first Monday of every month, to serve without compensation until the first Monday of the following month, or until their successors are appointed. They' shall assemble whenever requested to do so by the secretary, and receive and investigate all charges of violation of card rules or rates preferred against any coal dealer or agent in the city and county of San Francisco, and report their findings to the secretary. They shall have the power to fix the time limit for the payment of any fines imposed by them. * * *"

"Sec. 9. Advertising, Circulars, etc. (a) Dealers in advertising coal are not permitted to state prices without adding the names of coal to be had for the prices named; both names and prices to correspond exactly with those on rate card. (b) Any circulars, posters, dodgers, cards, or signs conflicting with the card rates or rules displayed, found on the streets or circulated in any manner whatsoever, shall subject the dealer or agent, who caused their distribution, to the penalties, as are provided in section 13 of these by-laws for selling coal in violation of card rates or rules.

"Sec. 10. Two or More Yards. A member having two or more yards cannot dispose of his certificate of membership in the sale of one yard, and retain his membership in the association.

"Sec. 11. New Yards. Any member opening a new yard or yards after June 14th, 1895, in addition to the one that secured his admission in the association, shall be liable for an additional two hundred (200) dollars admittance fee and monthly dues for each yard so opened, in order for such yard or yards to participate in the benefits of the association.

"Sec. 12. Standard Rules and Weights. (a) No dealer shall give more or less than 100 pounds to 1 sack; 500 pounds to 5 sacks, or ¼ ton (short); 1,000 pounds to 10 sacks, or ½ ton (short); 2,000 pounds to 20 sacks, or 1 ton (short); 2,240 pounds to 1 ton (long). (b) All long tons must be delivered in bulk. Names of coal must appear on bill exactly as they read on rate card. A load of coal delivered in bulk shall be per ton of 2,240 pounds. If handled after arrival at customer's place, an additional charge of fifty cents per ton must be made. A ton of coal delivered in twenty sacks, and put in bin, shall be 2,000 pounds. No premiums or presents are permitted to be offered as inducements for purchasers to buy coal. (c) Dealers shall be permitted to sell and deliver fifty pounds of coal at one-half card rates for one hundred pounds, but in no case shall they be allowed to sell coal in quantities ranging between fifty pounds and one hundred pounds.

"Sec. 13. Violations—Penalties. (a) If a dealer or agent, member or nonmember, be found guilty of selling coal in violation of the card rates or rules, he shall be subject to a fine of not less than ten (10) dollars nor more than one hundred (100) dollars for first offense, not less than twenty-five (25) dollars nor more than two hundred (200) dollars for second offense; if a member of the association, be suspended and compelled to pay retail prices for third offense until restored to membership in good standing by the board of directors. * * *

"Sec. 14. Agreement. The following agreement between the wholesale coal dealers of the city and county of San Francisco, Cal., and this association, is hereby embodied in this section, and made a part and parcel of the by-laws of this association:

" 'This agreement, made this first day of June, A. D. 1896, by and between the Coal Dealers' Association of California, an association, and the undersigned wholesale coal dealers, witnesseth: (1) That the purposes of this agreement are:

First, protection to consumers in receiving full amount and kind of coal purchased; second, protection to dealers in obtaining sufficient margin to carry on a safe business with justice to consumers. (2) That said wholesale dealers will not, nor will any or either of them, during the continuance of this agreement, sell coal at trade rates to any one not having an established yard; nor will any or either of them sell coal at less than card rates to consumers, except in such cases as may be provided for by agreement among said wholesale dealers themselves. (3) That said wholesale coal dealers hereby acknowledge the request of the Coal Dealers' Association of California, made to them on the sixth day of May, 1896, to charge one dollar ($1.00) per ton additional over present trade rates for all coal sold by said wholesale dealers, or any or either of them, to the retail dealers in the city and county of San Francisco, who are not members of said association, and hereby agree to comply with said request, and will during the continuance of this agreement charge one dollar ($1.00) per ton additional over trade rates for all coal sold to dealers carrying on business in said city and county who are not members of said association. (4) That upon receiving proof from the Coal Dealers' Association of the violation by any retail coal dealer of any of the rules of business printed on the rate card issued by said association, and being satisfied that the charge is established, said wholesale coal dealers agree, and each of them agrees, to, and will, charge the dealer so violating said rules or rule consumers' rates thereafter for coal, until said retail dealer, if a member of said association, shall have been reinstated to membership in the Coal Dealers' Association of California by the vote of the board of directors of said association, or, if not a member, until he shall have paid such reasonable penalty as may be imposed upon him by said association. (5) That the following rules and rates shall be enforced during the continuance of this agreement: That rates at which coal shall be sold to consumers shall be as shown on the rate card issued from time to time by the Coal Dealers' Association of California. A ton of coal delivered in twenty (20) sacks, and deposited in bin, will be 2,000 pounds; and no more nor less than twenty sacks shall constitute a ton so delivered. A ton of coal delivered in bulk shall be 2,240 pounds. For coal in bulk handled after arrival at place of delivery, an additional charge of fifty cents per ton shall be made, provided, however, if the handling after arrival at place of delivery consists only of shoveling or dumping coal in place of deposit, no additional charge shall be made. All long tons must be delivered in bulk. (6) That any member of the Coal Dealers' Association furnishing coal to another dealer who has been duly adjudged by the Coal Dealers' Association of California guilty of violation of the rules or any rule of said association printed on said rate card will himself suffer the penalty imposed by said association for violation of said rules. (7) That no member of the Coal Dealers' Association shall have the right to transfer his certificate of membership in said association until all indebtedness due to said wholesale coal dealers, or any of them, by the member of the said Coal Dealers' Association holding said certificate, shall have been paid, or until an adjustment between the debtor and creditors shall have been satisfactorily made by such debtor and creditors. (8) That in the event of the discontinuance of business by any member of said Coal Dealers' Association, and his failure to promptly settle his indebtedness due to said wholesale coal dealers, or any of them, then said Coal Dealers' Association shall have the right to declare such delinquent member's certificate forfeited to said wholesale coal dealers parties hereto, who are his creditors. That the said wholesale coal dealers for whose benefit said forfeiture takes place shall have the right to sell said membership certificate, and, upon the sale thereof, shall apply the proceeds of sale to the payment of the claims of the wholesale coal dealers parties hereto, holding claims against such delinquent member. That, after the application of the proceeds of such sale to the payment of the claims of said wholesalers, any surplus remaining shall be paid to the delinquent member. (9) And, in the event of a sale of his business, wholesale dealers shall decline to furnish coal to his successor, at the discretion of the association's directors, until the seller has paid all bills due by him to the wholesale dealers, who are parties hereto. (10) That this agreement does not apply to steam, hotel, restaurant, or church trade, nor to such trade as must be, necessarily, reserved by wholesale dealers as a means of protection to steam trade, and referred to in section 2 of this agreement. (11) That this agreement shall continue in full force and effect for the period of two years from date hereof, and shall apply only to said wholesale coal dealers and

retail coal dealers carrying on business within the city and county of San Francisco.

" 'In witness whereof, the parties hereunto set their hands, the day and year first above written, said Coal Dealers' Association signing by its president and secretary, thereunto authorized by resolution of said association duly passed, and said wholesale coal dealers signing their respective names.

" '[Signed]  Coal Dealers' Ass'n of California,
" 'By P. Lynch, President,
" 'By E. K. Carson, Secretary.
" 'Charles R. Allen.
" 'Central Coal Co.,
" 'By J. J. McNamara.
" 'R. D. Chandler.
" 'Geo. Fritch,
" 'Per J. Homer Fritch.
" 'C. Wilson & Co.
" 'Oregon Improvement Co.,
" 'John L. Howard, Manager.
" 'Oregon Coal & Navigation Co.,
" 'By C. M. Goodall, Vice Pres.
" 'W. G. Stafford & Co.
" 'R. Dunsmuir & Sons,
" 'By C. H. Jouett.'

"Sec. 15. Agencies or Offices. (a) Any member having agencies or offices other than those located at his yard, for the sale of coal, shall be compelled to have a certificate of membership for each of said agencies or offices. (b) In the event of the failure of any member to secure a certificate of membership for each agency or office, as referred to in paragraph (a) of this section, within five days after a written notice shall have been sent him by the secretary, he shall immediately cause the same to be closed, or subject himself to a fine of not less than ten (10) dollars nor more than one hundred (100) dollars for each agency or office that is known to be operated by him or for his benefit.

"Sec. 16. Sales to Nonmember Dealers or Agents. (a) No member of this association shall be permitted to sell dealers or agents, who are nonmembers, coal for less than consumers' prices. * * *"

The bill further alleges that the constitution and by-laws, since their adoption, have been, and now are, in full force and effect, save as amended by making the fee of membership $500 instead of $200, as is provided in article 4 of the constitution, and by amending subdivision 3 of the agreement, set out in section 14 of the by-laws, by changing the words "one dollar ($1)" to "two dollars ($2)," where the same appears in said paragraph, and by changing the schedule of rates from time to time, so that the schedule of rates and rate card are as set forth in the bill. The terms of the agreement between the Coal Dealers' Association and the importers and wholesale dealers in coal, as set forth in the by-laws of the Coal Dealers' Association, are made the subject of still further allegations of combination, conspiracy, and confederation between the coal dealers in the establishment and maintenance of arbitrary rates for coal in San Francisco, and in depriving the residents of San Francisco of the benefits of free competition between owners, importers, and dealers in coal from British Columbia, Washington, and Oregon, whereby the trade, traffic, and commerce in this article has been monopolized and restrained, and dealers in coal who have been refused or were unable to become members of the Coal Dealers' Association have been compelled to desist from said business, and have been restrained from carrying on their trade, business, and dealing in coal in the city of

San Francisco brought from British Columbia, Washington, and Oregon. The prayer of the bill is that the Coal Dealers' Association be dissolved; and that the agreement between said association and the wholesale dealers be set aside; and that the defendants be enjoined and prohibited from further agreeing, combining, conspiring, and acting together to maintain rules and regulations and rates and prices for coal brought from British Columbia, Washington, and Oregon to San Francisco, for domestic purposes as fuel, to hinder trade and commerce between said states and foreign countries; and that all and each of them be enjoined and prohibited from entering and continuing in the combination, association, and conspiracy to deprive the people of the city of San Francisco of such facilities, rates, and prices for coal brought from British Columbia, Oregon, and Washington to the city of San Francisco, in the state of California, as will be afforded by free and unrestrained competition between the owners, operators, importers, and dealers of said coal used from said places in said city of San Francisco, for domestic purposes as fuel; and that all and each of said defendants be enjoined and prohibited from agreeing, combining, and conspiring and acting together to monopolize, or attempt to monopolize, said trade and commerce in coal between said states of Oregon, Washington, California, and said foreign country of British Columbia; and that all and each of said defendants be enjoined and prohibited from agreeing, combining; and conspiring and acting together to prevent each and any of their association from importing, dealing, and delivering coal from British Columbia, Washington, and Oregon to the city of San Francisco, state of California, and from dealing in the trade and commerce of the same between said states and said foreign country at such rates as shall be fixed by each of said defendants acting independently and separately on its own behalf.

Two affidavits supporting the material allegations of the bill were filed with the bill on December 16, 1897. One of these, made by a retail coal dealer in San Francisco, who is not a member of the Coal Dealers' Association, alleged, among other things, that, by reason of the fact that the constitution and by-laws of the Coal Dealers' Association and the agreement between the wholesale dealers and said association prohibited the sale to him of coal brought from Washington, Oregon, and British Columbia except at advanced prices, he had been greatly restrained and hindered in his dealings. Upon this showing, the court issued an order requiring the defendants to show cause, on the first Monday in January, 1898, why an injunction should not be issued, as prayed for in the bill, pending the litigation, and in the meantime the defendants were restrained and prohibited from charging or collecting from persons engaged in the retail coal trade in the city of San Francisco a price in excess of the same charged and collected from members of the Coal Dealers' Association for like purchases, in quantity and quality, of coal imported or brought from British Columbia, and from the states of Washington and Oregon. On December 18, 1897, the defendants appeared specially, and moved to set aside the preliminary restraining order, upon the grounds that the order was made without notice

to the defendants; that no irreparable injury had been shown to be probable by reason of the conduct of the defendants in the particulars in which they are sought to be restrained in the preliminary restraining order, nor in any particular; that the restraining order was not in accordance with the rules of practice of this court in such cases; that the act of July 2, 1890, commonly known as the "Anti-Trust Act," does not provide for any preliminary injunction or restraining order. The hearing of this motion was noticed for December 28, 1897, and afterwards continued to the first Monday in January, 1898, when it was heard at the same time with the order to show cause. The two matters will now be considered together.

Section 4 of the act of July 2, 1890, provides as follows:

"The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the attorney general, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition, the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

Under section 718 of the Revised Statutes, the court or judge is authorized, whenever notice is given of a motion for an injunction, to grant an order restraining the act sought to be enjoined until the decision upon the motion, where there appears to be danger of irreparable injury from delay. In so far as the language of the anti-trust act differs from the provisions of the Revised Statutes, it appears to have been the intention of congress to provide a more direct and summary proceeding in reaching the mischief which it was the purpose of the statute to remedy than had prevailed before under the general rules of equity practice. I am therefore clearly of the opinion that, under section 4 of the anti-trust act, a restraining order may be issued by the court or judge without notice, under the circumstances sanctioned by the established usages of equity practice. That practice requires, as a general rule, that notice of an application for a temporary restraining order, as well as for an injunction, shall be given to the person against whom it is desired; but in very pressing cases, where the mischief sought to be prevented is serious, imminent, and irremediable, the courts will grant a restraining order without notice, and they will do so where the mere act of giving notice to the defendant of the intention to make the application might of itself be productive of the mischief apprehended, by inducing him to accelerate the act in order that it might be completed before the time for making the application has arrived. Fost. Fed. Prac. § 231. In the present case there is no allegation in the bill that the retail coal dealers or coal consumers of San Francisco, for whose benefit it may be assumed the action is brought, will suffer irreparable injury by delay; but the anti-trust act does not, in terms, require such a showing to justify the court in issuing a restraining order, and it may well be doubted whether such a showing would be

required even under the general rules of equity practice in a case involving a question of monopoly and restraint of trade. Barthet v. City of New Orleans, 24 Fed. 563; U. S. v. Addyston Pipe & Steel Co., 78 Fed. 712, 716. It will not be necessary, however, to pass definitely upon this question in this case, since it is my purpose to consider and determine, without further delay, the questions presented upon the order to show cause why an injunction should not issue pending the litigation. But, before proceeding to that feature of the case, there is a further objection to be noticed.

It is contended that, as the Coal Dealers' Association is an unincorporated company, it cannot be brought into court by making it a party defendant by that name. In equity, the action must be against the individuals comprising such an association; but there is this exception: Where the parties are numerous, some of them may be brought in as representing the whole association. The title of this case is against "The Coal Dealers' Association of California, and All the Members of Said Association," and also against 17 individuals, who are designated as "Members and Officers of said Association." The return of the marshal shows that all these individuals have been served; that the president of the association has been served as an individual, and as president of the association; and he has appeared in the capacity of president in the affidavit filed by him, as has also the secretary of the association. This, I think, is sufficient, under the rule requiring sufficient parties, to represent all the adverse interests in the suit.

In response to the order to show cause, affidavits have been interposed by the defendants for the purpose of disproving the equity upon which the motion is founded; also a demurrer to the bill and parol exceptions to its legal sufficiency. The affidavits tend to show that the statement in the bill, that 800,000 tons of coal are used annually as fuel for domestic purposes by the inhabitants of San Francisco, is not true; that the number of tons so used does not probably exceed 400,000 tons, and the amount imported and brought into San Francisco annually from British Columbia, Washington, and Oregon, and used for domestic purposes, is not in excess of 300,000 tons; that the defendants named in the bill as wholesale dealers and importers of coal are not all the wholesale dealers who handle, buy, and import, and sell coal used in San Francisco for domestic purposes; that the Black Diamond Coal Company is a corporation which handles, brings, and imports and sells coal used as fuel for domestic purposes, and that this corporation is not associated with any of the defendants, nor a party to the agreement with the Coal Dealers' Association of California; that the price and cost of mining and transporting coal from British Columbia, Washington, and Oregon have not been materially cheapened within the past few years, but have lately been increased, owing to the mine owners' inability to procure a sufficient number of miners since the exodus to the Alaska gold fields, and also by reason of the high rate for transporting coal from the above-mentioned places, due to the great demand for vessels in Alaska trade; that before the organization of the Coal Dealers' Association, and before the agreement mentioned

in the bill, the prices of all coals sold in the city and county of San Francisco, except British Columbia coal, used as fuel for domestic purposes, were largely in excess of the prices now charged; that in May, 1896, one month previous to the organization of the Coal Dealers' Association, British Columbia coals were $9.50 and $10 per ton, Washington coals were $8 per ton, Oregon coals $7.50 per ton; and a few months after said organization Washington coals were reduced to $7.50 per ton, and fluctuated from that price to $8, $7, and $7.50, which is the highest price; Oregon coals were reduced to $7 per ton, then $6.50 and $6.25, and now is $6.55; British Columbia coals have not changed in price, notwithstanding the duty on coal has been increased 40 cents to 67 cents per ton; that, prior to the organization of the Coal Dealers' Association, there were many persons engaged in the retail coal trade in the city of San Francisco who practiced dishonest methods, in giving short weights, substituting lower grades of coal for better grades, and in omitting to pay the amounts due from them to the wholesale dealers, to the injury of the wholesale dealers as well as to the retail trade. It is alleged that, in order to discourage these evils, the Coal Dealers' Association was formed and the agreements entered into between the association and the wholesale dealers, and it was in consideration of this partial security that the wholesale dealers agreed to sell to members of the association at a price less than that charged to nonmembers; that the agreement was entered into only for the purpose of dealing with and affecting coal in the state of California and city and county of San Francisco, and not for the purpose of monopolizing, conspiring, or attempting to monopolize or restrain the coal trade and commerce between British Columbia, Washington, Oregon, and California. It is further alleged that no sale of coal imported from any other state or territory is made to any member of the Coal Dealers' Association until after the same has been imported and delivered to the wholesale dealers, and bulk broken. The affidavits contain other allegations in relation to the coal business, which it will not be necessary to notice, in the view I take of the matters proper to be considered on this motion.

The title of the anti-trust act indicates the comprehensive scope and purpose of the statute. It is "An act to protect trade and commerce against unlawful restraints and monopolies." It is not limited to contracts and agreements that were unlawful at common law, nor to restraints and monopolies in violation of state statutes.

In U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290–327, 17 Sup. Ct. 540, the supreme court, referring to this title, said:

"The title refers to, and includes, and was intended to include, those restraints and monopolies which are made unlawful in the body of the statute. It is to the statute itself that resort must be had to learn the meaning thereof, though a resort to the title here creates no doubt about the meaning of and does not alter the plain language contained in the text."

The first and second sections of the act are as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be

deemed· guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or· attempt to monopolize,· or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction, thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

In the Freight Ass'n Case, supra, it was contended that this statute, in declaring illegal every combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, did not mean what its language imports, but that it only meant to declare illegal any such contract which is in unreasonable restraint of trade, while leaving all others unaffected by the provisions of the act. The court discusses this question, and arrives at the conclusion that:

"When, therefore, the body of an act pronounces as illegal every contract or combination in restraint of trade or commerce among the several states, etc., the plain and ordinary meaning of such language is not limited to that kind of contract alone which is in unreasonable restraint of trade, but all contracts are included in such language, and no exception or limitation can be added without placing in the act that which has been omitted by congress."

It is therefore no defense of a contract or combination, alleged to be in violation of the act, to say that, in view of all the circumstances and conditions, the contract or combination ·imposes only a fair and reasonable restraint upon trade and commerce. The question is, does it impose any restraint whatever? If it does, no matter how little or reasonable it may be, it is within the prohibition. This interpretation is in harmony with the other provisions of the statute, which make it unlawful to monopolize, or attempt to monopolize, any part of the trade or commerce among the several states or with foreign nations. The contract under consideration in the Freight Ass'n Case related to traffic rates for the transportation of persons and property by competing common carriers by railroad; but the doctrine of the case applies as well to articles of commerce— the subject of transportation—as it does to the business of transportation itself; and the clear and positive purpose of the statute must be understood to be that trade and commerce within the jurisdiction of the federal government shall be absolutely free, and no contract or combination will be tolerated that impedes or restricts their natural flow and volume.

Under the law as thus interpreted, two questions arise upon the facts in the present case. First. Do the constitution and by-laws of the Coal Dealers' Association and the agreement of the association with the importers and wholesale dealers operate in restraint of trade and commerce, or monopolize any part of the trade or commerce of San Francisco? And, if so, second, does this restraint or monopoly extend to any part of the trade and commerce carried on between this state and Oregon, Washington, or British Columbia?

There is no difficulty in arriving at a conclusion with respect to the first question. The constitution of the Coal Dealers' Association provides, among other things, that its object is to furnish information

to its members as to sales of coal made by wholesale dealers to the retail dealers, and by retail dealers to consumers, and also the names of any dealers who have been guilty of violating any of the rates or rules made from time to time by the organization. A retail dealer is defined as any person who engages in the sale of coal as regular business, buying to sell again, who shall own and operate a yard, keeping an office, and displaying a sign. All miners and shippers shall be eligible to membership in the association, provided such miner and shipper shall not make a practice of selling coal at retail at less prices than the retail dealers. The admittance fee for membership is $500, but the association assumes the jurisdiction over dealers who are not members, and imposes fines upon those found guilty of selling coal in violation of card rates or rules. The fine is not to be less than $10 nor more than $100 for the first offense, and not less than $25 nor more than $200 for the second offense; and, if the nonmember shall neglect or refuse to pay any fine within the time limit fixed by the grievance committee, the secretary, at the expiration of the time, shall notify the wholesale coal dealers to charge the person so defaulting consumers' prices for coal, and the wholesale dealers agree to comply with the notice. The board of directors of the association may employ detectives to purchase coal at retail through any citizen. The purpose of this provision appears to be to discover those dealers who sell coal at other than card rates. A grievance committee is provided to assemble whenever requested to do so by the secretary, to receive and investigate all charges of violation of card rules or rates preferred against any coal dealer or agent in the city and county of San Francisco. It will be observed that the jurisdiction of this committee is not limited to the investigation of charges against members of the association, but includes all dealers. Dealers in advertising coal are not permitted to state prices without adding the name of the coal to be had for the prices named. Both names and prices to correspond exactly with those on the rate card. Any circulars, posters, dodgers, cards, or signs conflicting with the card rates or rules displayed, found on the streets, or circulated in any manner whatsoever, subjects the dealer or agent who caused their distribution to the penalties for selling coal in violation of card rates or rules. No dealer in coal is permitted to give more or less than certain weights in selling coal in specified quantities from sacks to tons. A charge is fixed for handling coal at customer's place, and no premiums or presents are allowed to be offered as inducements for purchasers to buy coal. The agreement with the wholesale dealers is made part of the by-laws of the association. The wholesale dealers agree not to sell at trade rates to any one not having an established yard, and not to sell coal at less than card rates to consumers, except in such cases as may be provided for by agreement among the wholesale dealers themselves. They agree to charge two dollars per ton additional over current trade rates to retail dealers who are not members of the Coal Dealers' Association, and consumers' rates to dealers who violate any of the rules of the association. A schedule of rates is adopted for the different qualities and classes of coal sold in San Francisco.

It is claimed on the part of the defendants that the Coal Dealers' Association is a beneficial organization; that it protects the coal consumers from the dishonest methods of some of the coal dealers in giving short weights and in substituting lower grades of coal for better grades; and that it also protects the wholesale dealers in enabling them to collect their bills from the retail dealers. All this may be true, but it is clear that the power of the association extends much further, and that it has another purpose. It establishes arbitrary rates for coal, from which the dealer is not permitted to deviate in any particular. It stifles all competition between retail dealers, restricts trade within prescribed limits, and establishes a monopoly of the most odious character in an article of daily consumption and prime necessity.

In Nester v. Brewing Co., 161 Pa. St. 473, 29 Atl. 102, the supreme court affirmed the judgment of the court of common pleas of Philadelphia, holding that a combination among a number of brewers of that city to control the price of beer within the city was illegal, being in restraint of trade. The agreement under which that combination was formed is of the same character as the one now under consideration, and this is what the trial court had to say about it:

"Where a price is fixed arbitrarily for which a manufactured article may be sold, it necessarily limits the production of that article to the amount that can be sold for that price. An increased price put upon an article restricts its sale, and the restricted sale necessarily reduces the production. It is no answer to say: 'We do not restrict your production. You may produce any amount you like. We only restrain your sale of it.' Is this not practically a limit to production? Where a pool or combination reserves the right to regulate prices, they can, by the manipulation of prices, drive their competitors out of business, create a monopoly, and enhance at their pleasure the prices to consumers."

This is precisely the attitude of the Coal Dealers' Association, and it is no answer to the charge of arbitrary power, which it can and does exercise under its organization, that it has not increased the price of coal in San Francisco, or wholly monopolized the source of supply. The terms of the organization and the agreement between the association and the wholesale dealers clearly constitute a restraint of trade, which is injurious to the public interests, against public policy, and therefore unlawful. Arnot v. Coal Co.; 68 N. Y. 558; Salt Co. v. Guthrie, 35 Ohio St. 666; Carbon Co. v. McMillin, 119 N. Y. 46, 23 N. E. 530; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Craft v. McConoughy, 79 Ill. 346; Lumber Co. v. Hayes, 76 Cal. 387, 18 Pac. 391; Distilling & Cattle Feeding Co. v. People (Ill. Sup.) 41 N. E. 188; Harrow Co. v. Hench, 83 Fed. 36.

The next question is as to whether this restraint or monopoly extends to the trade or commerce among the several states or with foreign nations. In other words, do the facts in the case bring it within the jurisdiction of the national government, under the provisions of the anti-trust act? The retail prices for coal at San Francisco established by the Coal Dealers' Association, and agreed to by the wholesale dealers, are for different quantities of the following named coals, used as fuel for domestic purposes, namely: Wellington (Dunsmuir), Wellington (Southfield), Roslyn, Seattle, Bryant, and Coos Bay. The Wellington coal is imported from British Co-

lumbia; the Roslyn, Seattle, and Bryant, from Washington; and the Coos Bay, from Oregon. No card rate appears to have been fixed for coal produced in this state, probably because this quality of coal is not generally used for domestic purposes. We start, then, with the fact that the article which is the subject of the controversy is the product of other states and a foreign country, and is brought from such other states, and imported from the foreign country, by dealers and importers engaged in that business, and that these dealers and importers have entered into an agreement and combination with the Coal Dealers' Association whereby the business in dealing in this article is regulated and its retail prices in San Francisco fixed arbitrarily. The statement of these facts seems to be sufficient to determine the question; but it is contended very earnestly, on the part of the defendants, that the case presented by the bill is not within the law, and that the line dividing local from federal authority excludes it from the jurisdiction of this court.

What, then, is trade and commerce among the several states and with foreign nations? "Trade," in a business sense, has been defined as "the exchange of commodities for other commodities or for money; the business of buying and selling; dealing by way of sale or exchange." The word "Commerce," as used in the statute and under the terms of the constitution, has, however, a broader meaning than the word "trade." Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale, and exchange of commodities. County of Mobile v. Kimball, 102 U. S. 702; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 823. Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior. Gibbons v. Ogden, 9 Wheat. 1, 194.

In Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, the supreme court held that a state statute, prohibiting the sale of intoxicating liquors, except for certain purposes and under license from a county court, was unconstitutional and void when applied to a sale by an importer of liquors brought from another state in the original packages, because the operation of the law was repugnant to the power of congress to regulate commerce among the several states. The court, in passing upon the question, said:

"The power vested in congress 'to regulate commerce with foreign nations and among the several states and with the Indian tribes' is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the constitution. It is co-extensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, but must enter its interior, and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered."

Again, to make this limitation on state authority over interstate commerce more clear, the court said:

"It is only after the importation is completed, and the property imported has mingled with and become a part of the general property of the state, that its

regulations can act upon it, except so far as may be necessary to insure safety in the disposition of the import until thus mingled."

If a law of a state, regulating the sale of intoxicating liquors, so as to prohibit their sale except for certain purposes and under license from a county court, is unconstitutional and void when applied to a sale by an importer of liquors brought from another state in the original packages, because the law in that relation is in restraint of trade and commerce "among the several states," what shall be said of the constitution and by-laws of the Coal Dealers' Association, and the agreement of that association with the wholesale dealers respecting the sale of imported coal in San Francisco under the anti-trust act? If one is in restraint of commerce, is not the other? The claim that the coal is not sold until imported, delivered, and bulk broken is not sufficient. The principle of the original package does not apply to the sale of coal. It must be manifest that the arbitrary rules under which the combination of wholesale and retail dealers conduct their business affects the sale and disposition of coal immediately upon its arrival at San Francisco, and that, as an article of commerce, its freedom is restrained and hampered at the point of delivery into the state, and before it has become distributed by sale, and mingled in the common mass of property in the state. But the agreement of the importers and wholesale dealers, which alone gives life and force to the combination, is directed specifically to the maintenance of card rates for certain imported coals by name; and it is this agreement, and what may be accomplished under it by the combination, that is to be considered, and not what the parties to it may be doing at any particular time.

In Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592, it was held by the supreme court that a law of Tennessee, requiring that all drummers and all persons not having a regular licensed house of business in the taxing district of Shelby county, offering for sale or selling goods, wares, or merchandise therein by sample, should pay to the county trustee the sum of $10 per week, or $25 per month, for such privilege, was, so far as it applied to persons soliciting the sale of goods on behalf of individuals or firms doing business in another state, a regulation of commerce among the several states. This case also arose before the passage of the anti-trust act, and was considered as coming within the established doctrine that congress had the exclusive power to regulate commerce under the constitution of the United States. Now, if this doctrine is applied to the facts of the present case, how can it be said that the rules and regulations imposed by the Coal Dealers' Association upon retail coal dealers of San Francisco, selling imported coal, is less an obstruction to commerce than the law of Tennessee, imposing a license tax upon drummers soliciting the sale of goods from another state? Manifestly, a court could not consistently condemn the latter, and excuse the first. Suppose the state of California were to provide, by statute, a fixed price for the sale, at retail in San Francisco, of Wellington, Roslyn, Seattle, Bryant, and Coos Bay coal, and require that all retail dealers in such coals should pay a license to the state of $500 for the privilege of dealing in such coals at the established rates, and, to secure the

enforcement of such a law, should impose penalties on dealers who did not comply with the statute. Would there be any question as to the validity of such a statute? Would it not be so plainly in violation of the constitution and laws of the United States that no court would hesitate for a moment to declare it void? With what complacency, then, should the court view the terms of the agreement of the wholesale dealers with the Coal Dealers' Association, and the regulations, fees, dues, assessments, fines, and penalties provided by the latter association for the purpose of controlling all coal dealers engaged in dealing in these imported coals?

In the Sugar Trust Case, 156 U. S. 1, 15 Sup. Ct. 249, it was held, substantially, that contracts relating to commodities, to come within the range of federal jurisdiction, must be subsequent to production, but it was also said that contracts to buy, sell, or exchange goods to be transported among the several states form part of interstate trade or commerce. A case entirely in point is that of U. S. v. Jellico Mountain Coal & Coke Co., 46 Fed. 432. brought under the anti-trust act, in 1891, against the members of the Nashville Coal Exchange. The purpose of the agreement in that case was to establish the price of coal at Nashville, and to change the same from time to time. Members found guilty of selling coal at a less price than the price fixed by the exchange, either directly or indirectly, were fined 2 cents per bushel and $10 for the first offense, and 4 cents per bushel and $20 for the second offense. Owners or operators of mines were not to sell or ship coal to any person, firm, or corporation in Nashville who were not members of the exchange, and dealers were not to buy coal from any one not a member of the exchange. It appeared that several mining companies in Kentucky engaged in raising coal and most of the coal dealers of Nashville had entered into this agreement. The court held the agreement was in restraint of trade and commerce, and that the defendants, by the organization of the Nashville Coal Exchange, and in their operations under it, had violated the law; and they were accordingly enjoined from further violations of the law. In U. S. v. Hopkins, 82 Fed. 529, the Kansas City Live-Stock Exchange, a voluntary unincorporated association, adopted articles of association and rules and by laws whereby they agreed that they would faithfully observe and be bound by the same. Among the rules for the government of the exchange were fixed rates of commissions for the transaction of business, and limitations and prohibitions upon its members in dealing with nonmembers and with persons violating the rules and regulations of the exchange; these rules and regulations being enforced by means of fines, penalties, and assessments. Substantially all of the business transacted in the matter of receiving, buying, selling, and handling live stock at Kansas City stockyards was carried on by the members of the exchange as commission merchants. A large proportion of this live stock was shipped from the states of Kansas, Nebraska, Colorado, Texas, Missouri, Iowa, and Arkansas, and the territories of Oklahoma, Arizona, and New Mexico, and was sold by the members of the exchange to the packing houses in Kansas City. It was held that the association

was an illegal combination to restrict, monopolize, and control trade and commerce.

It is not, however, necessary to multiply authorities dealing with this question. They are numerous, and they all clearly establish the doctrine that commerce among the several states and with foreign nations must be absolutely free and untrammeled, except as it may be regulated by congress; that no state law, with certain exceptions not necessary to be here stated, will be allowed to interfere with it, and no contract or agreement on the part of individuals, associations, or corporations will be permitted, directly or indirectly, to hinder or restrain its natural current or volume. In the light of the authorities and the principles they establish, it appears to me that the constitution and by-laws of the Coal Dealers' Association and the agreement of the wholesale dealers with that association come within the prohibitions of the act of July 2, 1890, and they are therefore unlawful. A temporary injunction will be prepared in accordance with this opinion.